Crim. No. 7662.   In Bank.   Mar. 25, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. ROY ALLEN
STEWART, Defendant and Appellant.

Edwin Malmuth, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—The jury found defendant guilty of robbery and murder of the first degree and fixed the penalty at death. The trial court denied his motion for a new trial and

for a reduction of the penalty. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant contends that his confession was improperly admitted at the trial because he was not informed of his right to counsel and of his right to remain silent prior to the time he confessed and because he gave his confession involuntarily. He also contends that during the penalty trial the trial judge gave an instruction condemned in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33].

Since we conclude that the admission of defendant's confession constituted reversible error in view of our recent holding in *People* v. *Dorado* (1965) *ante,* p. 338 [42 Cal. Rptr. 169, 398 P.2d 361], we need not reach the issues raised by defendant's other contentions.

During December 1962 and January 1963 a series of robberies accompanied by beatings took place in a neighborhood of Los Angeles. On December 21, 1962, an assailant struck Mrs. Meriwether Wells while she was walking down the street and took from her a handbag containing $5 to $10, a wallet bearing her maiden name, charge-a-plates in the names of Mr. and Mrs. Robert K. Wells, a salary check payable to Mrs. Wells, a salary check payable to Mr. Wells, and three dividend checks. Mrs. Wells, who suffered a fractured jaw, said that the culprit was a "colored man," but she was unable to identify him.

On January 10, 1963, someone robbed Mrs. Tsuru Miyauchi of her leather lunch bag, containing a red change purse with her daughter's name on it, pictures, keys, and $8 to $10 in cash. As she was walking down the street, the assailant hit her on the head with a blunt instrument, causing her to suffer a fractured skull and a broken nose. She could not identify the robber.

On January 19, 1963, Miss Lucile O. Mitchell was beaten and robbed of a silver cufflink, a transistor earplug, a black leather case for such an earplug, a watch, and a charge-a-plate. Miss Mitchell, who was found on a house porch, subsequently, without having identified the attacker, died from a head wound.

On January 25, 1963, Mrs. Beatrice Dixon, while walking down a street, was hit on the head and robbed of her large leather bag containing a billfold, $23, a black coin purse, cash, and a door key on a chain bearing her initial, "B." Mrs. Dixon could not identify the person who hit and robbed her.

When, on January 30, 1963, Miss Maria Louisa Ramirez was walking down a street, someone hit her on the side of her head. When she regained consciousness, her purse containing a wallet, a coin purse, and a pair of glasses in a case were gone. The police officer investigating the robbery found the charge-a-plate taken from Miss Mitchell on the ground about 18 inches from the place where Miss Ramirez had been lying. A witness to the crime testified at the trial that defendant looked like the assailant, but she did not make a positive identification.

Mr. Wells, husband of the first of the above victims, reported to the police that the dividend checks stolen from his wife bore the endorsement, "Robert K. Wells." He said that he had never endorsed the checks. The police then interviewed a Mr. Sam Newman, who operated the market where the checks had been cashed. Mr. Newman related that because the person who cashed the checks lacked identification, a Mrs. Lena Franklin, who was then in the store and was apparently acquainted with the defendant, cosigned them. On January 31, Mrs. Franklin pointed out to a police officer the defendant as the one who cashed the checks.

The police officer went to defendant's residence and there informed him that he was under arrest for a series of "purse snatch robberies." When the officer asked if he could search the house, the defendant replied, "Go ahead." During the search, the officer found Mrs. Wells' purse and wallet, Mrs. Miyauchi's coin purse attached to a key that operated the door to defendant's house, Miss Mitchell's watch, Mrs. Dixon's coin purse and initialed key, and Miss Ramirez' wallet. On February 3, during a further search of the house the police found Miss Ramirez' glasses and Miss Mitchell's cufflink, transistor earplug and case.

Likewise on January 31, the police arrested four other people who were in the house at the time of defendant's arrest. The police later determined that besides defendant the only other people who actually lived in the house were a woman referred to as Lillian Lara[1] and her daughter. The police interrogated all five persons.

The police officers testified at the trial that during the interrogations of the defendant on January 31 and on Feb-

---

[1] Some question arose as to whether defendant and Lillian Lara were married. During the January 31 interrogation, which was recorded, defendant referred to a "Lillian Davis" as a "girl friend" at whose house he spent two or three nights a week. Defendant testified that he and Lillian Lara had been married in Mexico.

ruary 1 he denied any knowledge of the checks, even though confronted by Mrs. Franklin, the cosigner of the checks. A tape of the January 31 interrogation was introduced at the trial for impeachment purposes. According to one of the officers, on February 3 defendant said that if he could see Lillian Lara he might have "something to say." After a meeting with her, defendant admitted signing Wells' name to the checks and cashing them, but he claimed that he found the checks; he also denied having seen any of Mrs. Wells' other belongings prior to the date of the interrogation.

On February 4 the police showed defendant the objects found in his residence, but, according to the police officers, he denied having seen them before. One of the officers testified that defendant then said that he had brought the purse, subsequently identified as belonging to Mrs. Wells, to his house when he had moved there two months earlier. He also told the police that other people had brought some of the other stolen objects into the house. A police officer testified that defendant denied having seen Miss Ramirez' wallet; but the defendant said he found Mrs. Miyauchi's coin purse on the street. Another officer testified that when the defendant was shown Miss Mitchell's watch he at first denied having previously seen it, but then said someone brought it to his house. He later said he had bought the watch on the street and had given it to Lillian Lara.[2]

On February 5 defendant admitted that he robbed Miss Mitchell. An officer testified that defendant expressed sorrow at having killed Miss Mitchell and said, "I didn't mean to kill her." The police then recorded an interrogation during which defendant again admitted robbing Miss Mitchell. He denied hitting Miss Mitchell on the head; he did say, however, that he could have kicked her in the head after she fell and while he was escaping. He continued to insist that he had not participated in the other robberies.

The police brought defendant before a magistrate for the first time shortly after his confession. They then released

---

[2]At the trial defendant denied having said at any time that he had never seen the dividend checks or that he had found the checks. He asserted that a Jackie Jackson gave him the checks to cash. He also denied having said that he never saw Miss Mitchell's watch or having said that he had purchased it. He testified that Jackie Jackson and a Louis Bookman brought the stolen goods to his house. Jackie Jackson also testified that Louis Bookman brought the stolen goods to the house. Linda Lara, Lillian Lara's daughter, testified that Bookman and Jackie Jackson were in the house and that Jackie Jackson used Miss Mitchell's charge-a-plate.

the other persons arrested in connection with the crimes. An officer testified that an investigation of these people revealed "no evidence to connect them with any crime."

The transcriptions of the January 31 interrogation and of the February 5 confession of the robbery and other incriminating statements were admitted into evidence without objection, although during the trial defendant contended that he gave his confession involuntarily.[3] Nothing in the record indicates whether or not defendant was informed prior to his confession of his rights to counsel and to remain silent or whether he otherwise knowingly and intelligently waived those rights.[4]

Following the decision of the United States Supreme Court in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], we held in *People* v. *Dorado* (1965) *ante,* pp. 338, 353 [42 Cal.Rptr. 169, 398 P.2d 361], "that defendant's confession could not properly be introduced into evidence because (1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements, (4) the authorities had not effectively informed defendant of his right to counsel or of his absolute right to remain silent, and no evidence establishes that he had waived these rights."

The instant case presents the following principal questions: (1) whether, at the time defendant uttered the confession, the investigation had reached the accusatory or critical stage so that he was entitled to counsel, and hence to be advised of his rights to counsel and to remain silent if he did not otherwise waive those rights; (2) whether the lack of any indication in the record that defendant was advised of his rights to counsel and to remain silent precludes a finding that he was so advised. We set forth our reasons for answering each of these questions in the affirmative.

---

[3]Although the record does not indicate that the trial judge made an independent determination of whether the confession was voluntary, we do not probe the problem raised by *Jackson* v. *Denno* (1964) 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908], since we reverse on other grounds.

[4]The Attorney General admits that there is nothing "specifically showing whether appellant was or was not advised of his 'right to counsel and right to remain silent at the interrogation.'" In a number of instances, the police officers conducting the interrogations were asked to relate everything that was said during specific interrogations. They at no time indicated that they had advised defendant of his rights to counsel and to remain silent.

The United States Supreme Court in *Escobedo* fixed the point at which a suspect is entitled to counsel as that at which "the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession. . . ." (378 U.S. at p. 492.) The court also characterized the time when a person needs the "guiding hand of counsel" as that when the "investigation had ceased to be a general investigation of 'an unsolved crime' "; at that time the defendant "had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so." (*Id.* at pp. 485, 486.)

Normally "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect" (*Id.* at p. 490) at that point when the police officers place that suspect under arrest. But *Escobedo* indicates that the accusatory or critical stage is not reached unless another event occurs: the police must "carry out a process of interrogations that lends itself to eliciting incriminating statements." (*Id.* at pp. 490-491; see also *Id.* at pp. 485, 492.) That process may be undertaken either before or after arrest. Whenever the two conditions are met, that is, when the officers have arrested the suspect and the officers have undertaken a process of interrogations that lends itself to eliciting incriminating statements, the accusatory or critical stage has been reached and the suspect is entitled to counsel.

We believe that the arrest encompasses two of the circumstances which produced the accusatory stages in the *Escobedo* and *Dorado* cases: (1) the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, and (2) the suspect is in custody.

An arrest fulfills the first requirement that the investigation has begun to focus on a particular suspect. The Penal Code itself conditions the arrest upon the presence of reasonable ground for the belief that the individual committed the offense; section 813 predicates the issuance of a warrant upon "reasonable ground to believe that the defendant has committed" the offense; section 836 requires that the arrest must rest upon the officer's reasonable cause for believing the person committed the offense.

"Probable cause for an arrest," we have said, "is shown if a man of ordinary caution or prudence would be led

to believe and conscientiously entertain a strong suspicion of the guilt of the accused. . . . Probable cause may exist even though there may be some room for doubt. . . .  ▆▆  The test in such case is not whether the evidence upon which the officer made the arrest is sufficient to convict but only whether the prisoner should stand trial.'' (*People* v. *Fischer* (1957) 49 Cal.2d 442, 446 [317 P.2d 967]; see generally, Witkin, Cal. Criminal Procedure (1963) pp. 102-104; Fricke, Cal. Criminal Procedure (6th ed. 1962) pp. 19-20.)

▆▆  The arrest includes ''custody,'' the second condition present in *Escobedo* and *Dorado*. By definition in this state, an element of an arrest is custody. Thus, section 834 of the Penal Code states ''An arrest is taking a person into custody. . . .''

Since, once a person has been properly placed under arrest, probable cause must support it, we conclude that the investigation has at least ''*begun* to focus on a particular suspect.'' (378 U.S. at p. 490; italics added.) Indeed, as the court said in a case which, although based upon the McNabb-Mallory rule, cites *Escobedo,* ''Ordinarily, arrest is the culmination, not the beginning, of police investigation.'' (*Greenwell* v. *United States* (1964) 336 F.2d 962, 966.)

We turn to the further requirement of *Escobedo* that, beyond the ''focus'' and custody, the accusatory stage matures upon the undertaking by the police of a ''process of interrogations that lends itself to eliciting incriminating statements.'' (378 U.S. at p. 491; see *id.* at pp. 485, 492; *United States* v. *Konigsberg* (3d Cir. 1964) 336 F.2d 844, 853.)[5] Although in most cases the process of interrogations following an arrest will so lend itself, it does not necessarily do so.

In the *Konigsberg* case, *supra*, Federal Bureau of Investigation agents apprehended the defendants in a garage containing stolen goods, arrested them and took them to the bureau's office. At that office, prior to an arraignment, the agents asked Konigsberg '' 'why he was in this garage and just what had taken place . . . and . . . if he wished to cleanse himself or explain . . . what his reasons for being there were, why the other individuals were there.' '' (*Id.* at p. 852.)

---

[5] We do not agree with the suggestion of some writers that, for purposes of *Escobedo*, the accusatory or critical stage begins with the arrest alone. See Anderson, *Representation of Defendants, Panel Discussion* (1965) 36 F.R.D. 129, 141; Enker and Elsen, *Counsel for the Suspect: Massiah* v. *United States and Escobedo* v. *Illinois* (1964) 49 Minn.L. Rev. 47, 70-73; Note, *The Supreme Court, 1963 Term* (1964) 78 Harv. L.Rev. 143, 220.

Konigsberg then made some incriminating statements. Among other reasons for not applying *Escobedo,* the court said that the purpose of the interrogation, even though it took place after the arrest, was not to elicit a confession. The court stated, ''The uncontradicted purpose of the discussion was to give Konigsberg a chance to explain his presence in the garage if he could; to hear Konigsberg's side of the story. . . . If Konigsberg or any of the other people caught in the garage could account for their presence this was their opportunity.'' (*Id.* at p. 853; see *People* v. *Ghimenti* (1965) 232 Cal.App. 2d 76, 84 [42 Cal.Rptr. 504].)

The test which we have described does not propose a determination of the actual intent or subjective purpose of the police in undertaking the interrogations but a determination based upon the objective evidence. Whatever may be the subjective intent of the interrogators, we must, in order to determine if the police are carrying out ''a process of interrogations that lends itself to eliciting incriminating statements'' (*Escobedo* v. *Illinois, supra,* at p. 491), analyze the total situation which envelops the questioning by considering such factors as the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances.

As some writers have suggested, ''An objective test is . . . likely for the new American rule, for it is noteworthy that the question of 'purpose to elicit a confession' may be more readily determined from the objective evidence—such as the nature of the questions and accusations put to defendant and the length of the interrogation—than the question whether the police had decided to charge the defendant.'' (Enker and Elsen, *Counsel for the Suspect: Massiah* v. *United States and Escobedo* v. *Illinois* (1964) 49 Minn.L.Rev. 47, 71.)

In the instant case all of the above conditions had been fulfilled. Defendant was not only under arrest at the time he confessed but had been in custody for five days and had been interrogated daily. In his summation, the prosecutor referred to the interrogation of the defendant on January 31 concerning the robbery of Mrs. Wells as an ''accusatory circumstance.'' A police officer testified that on February 5 he entered the interrogation room and said to the defendant, ''Roy, you killed that old woman. . . .'' Such extensive interrogations during the period of defendant's incarceration could serve no other purpose than to elicit incriminating statements. Thus, prior to his confession, the defendant was

entitled to counsel under the *Escobedo* case, for the "accusatory" stage had been reached.

We do not think the contrary contention of the Attorney General that defendant's confession was procured at the investigatory stage can prevail in the light of the above facts. The Attorney General argues that the fact that the Mitchell watch had not been found among defendant's possessions but in a bureau drawer containing the possessions of Lillian Lara, as well as the fact of the continued custody of four other suspects of the crime, establishes that the police were still conducting a "general inquiry" and had not "begun to focus" on the defendant at the time of the confession. As we have explained above, the arrest of defendant demonstrates that the police believed that they had reasonable ground for attributing to him the commission of the crime. The continued custody of other suspects does not automatically negate the advent of the accusatory stage as to defendant; the above conduct of the police destroys that contention.

Concluding, therefore, that prior to his confession defendant was entitled to counsel under *Escobedo,* we probe the second major premise of the Attorney General that, despite the absence of a showing of advice to defendant of his rights to counsel and to remain silent, we can presume that such warning was given. The Attorney General bases his contention upon *People* v. *Farrara* (1956) 46 Cal.2d 265 [294 P.2d 21], which, in the absence of evidence to the contrary, expressed a presumption that the officers in that case lawfully performed their duties.

*Farrara,* we believe, can readily be distinguished from the instant case. There, appellants contended that the police obtained certain of the adduced evidence during an illegal search and seizure. Since the trial occurred prior to our decision in *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], declaring such evidence inadmissible, the record was barren of any showing as to the legality of the search. This court said, "It is settled . . . that error will not be presumed on appeal, . . . and in the absence of evidence to the contrary it must also be presumed that the officers regularly and lawfully performed their duties. (Code Civ. Proc., § 1963 subds. 1, 15, 33. . . ." (46 Cal.2d at p. 268.)

Whereas, long before *Cahan,* searches and seizures illegal under federal law had been illegal in California (Cal. Const., art. I, § 19), no such antecedent illegality had been present

in the *Escobedo* situation. Indeed, *Cahan* merely provided a remedy in the form of exclusion for evidence illegally seized. Until *Escobedo* and *Dorado,* however, the law of this state did not give an accused a right to counsel during pre-arraignment interrogations and therefore did not require that an accused be advised of his rights to counsel and to remain silent if he had not otherwise waived those rights.[6] We cannot presume that the police acted in accordance with an unannounced constitutional principle. We therefore cannot presume in the face of a silent record that the police informed defendant of his right to remain silent and of his right to counsel. (See *Carnley* v. *Cochran* (1962) 369 U.S. 506 [82 S.Ct. 884, 8 L.Ed.2d 70].)

In *Carnley* v. *Cochran* (1962) 369 U.S. 506 [82 S.Ct. 884, 8 L.Ed.2d 70], the United States Supreme Court said, "The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." (*Id.* at p. 516.) It follows that in order to establish a waiver of the right to the assistance of counsel the record must indicate that the defendant was advised of his right to counsel and to remain silent or that he knew of these rights and intelligently and knowingly waived them.

To presume in the instant case that absent the warnings defendant knew of his right to counsel at the prearraignment stage prior to the time that the United States Supreme Court established this right in Escobedo would be to ascribe to him an utterly fictitious clairvoyance.

Since we have said that the use of a confession obtained in violation of the defendant's constitutional right to counsel compels a reversal, we must reverse the judgment on the counts involving the robbery and murder of Miss Mitchell. (*People* v. *Dorado* (1965) *ante,* pp. 338, 356-357 [42 Cal. Rptr. 169, 398 P.2d 361].)

Because defendant, however, confessed only to the robbery and murder of Miss Mitchell, we must determine if the erroneous admission of his confession constituted prejudicial error as to those other robberies for which he was convicted but as to which he did not confess. (See *People* v. *Dorado, supra, ante,* pp. 338, 356.) A full examination of

---

[6]Section 825 of the Penal Code, guaranteeing a person arrested the right to see an attorney, does not signify that counsel must be allowed to be present during interrogations. (*People* v. *Garner* (1961) 57 Cal.2d 135, 165 [18 Cal.Rptr. 40, 367 P.2d 680] (Traynor, J., concurring).)

the record indicates that the error requires the reversal of the judgment on these counts since "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243].)

Thus the evidence adduced at the trial indicated that the same person participated in all of the charged robberies. All of the robberies took place in the same neighborhood; they were all committed in the same fashion; the police found at defendant's residence items stolen during each of the robberies. Because of the inter-relationship among these crimes, defendant's confession to the robbery and murder of Miss Mitchell composed strong evidence of his guilt on each of the robberies to which he did not confess.

The judgment is reversed.

Traynor, C. J., Peters, J., and Peek, J., concurred.

BURKE, J., Concurring.—The majority bases its reversal upon the admission into evidence of a voluntary confession in violation of the defendant's constitutional right to counsel, based upon this court's decision in *People* v. *Dorado, ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361]. As noted in my dissent in *Dorado,* concurred in by Mr. Justice Schauer, assuming that there was error in the admission of such voluntary confession the mandate of section $4\frac{1}{2}$ of article VI of the California Constitution requires this court to review the entire record to determine the probability that a result more favorable to the defendant would have been reached had the error not been committed (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) and that therefore there was a miscarriage of justice. The majority opinion in the case at hand does not indicate that there was a review of "the entire cause, including the evidence" and that the majority is of "the opinion that the error complained of has resulted in a miscarriage of justice." (Const., art. VI, § $4\frac{1}{2}$.)

Under the mandate of article VI, section $4\frac{1}{2}$, and of the supplemental rule of this court as to the test to be applied in determining whether such an error in the admission of evidence compels reversal (*People* v. *Watson, supra* (1956), 46 Cal.2d 818, 836), I have reviewed the entire cause, including the evidence, and have concluded that it is reasonably probable that a result more favorable to the defendant would have been reached if the subject evidence had not been erroneously

admitted against him. Under these circumstances the error compels reversal and I, therefore, concur in the reversal of the judgment of conviction.

SCHAUER, J.,* Dissenting.—I concur generally in the law as stated by Mr. Justice Burke in his concurring opinion, but after review of the entire cause, including the evidence, am not affirmatively persuaded that a result more favorable to the defendant would have been reached in the absence of the declared error.

The encompassing net of interwoven circumstances established by the prosecution is to me inherently more convincing than the direct uncorroborated statement of any single witness could ordinarily be. The confession here is significant principally because it is consistent with the only conclusion reasonably supported by the proof independently made. Assuming that such additional—in effect, cumulative—proof was erroneously received does not persuade me to the conclusion that in the absence of the error a result more favorable to the defendant would have been probable.

I would affirm the judgment in its entirety.

McComb, J., concurred.

Respondent's petition for a rehearing was denied April 21, 1965, and the opinion was modified to read as printed above. Mosk, J., did not participate therein. McComb, J., and Schauer, J.,* were of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.