[Crim. No. 10424.   Second Dist., Div. Three.   Aug. 19, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK JOSEPH PAULEY, Defendant and Appellant.

Max Solomon and Burton Marks for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—A jury convicted defendant of burglarizing the trailer of Mrs. Lovell on January 9, 1964. The victim was not in her trailer from 9 a.m. until 1 p.m. of that day. When she returned she discovered that several furs were missing. A chain on one of the doors had been broken.

Evidence pointing to defendant as the burglar consisted in the main of the following:

1. A Mrs. Sherer who lived in the same trailer park, next to Mrs. Lovell, saw a man force the cabana of Mrs. Lovell's trailer at 12:15 p.m. on January 9. She then saw him leave the trailer with a pink bag. She observed him going east on the sidewalk to a car, get in and drive away. She noted the license number of the car. She identified defendant as the man in question. She did not appear too certain of her identification and it seems apparent that she made a mistake concerning the color of the car she saw, if the car was defendant's.

2. Fingerprints taken within an hour or so after the burglary were fresh and were later identified as defendant's.

3. Records of the Department of Motor Vehicles showed that an automobile to which the license number observed by Mrs. Sherer had been issued, was registered to one Ann F. Pauley. On cross-examination of one of the arresting officers it was developed by defendant's own counsel that the lady was defendant's wife.

The defense consisted of: an alibi supported by the testimony of five witnesses, including defendant; an attempt to

674

show that fingerprints could have been left on the trailer on an earlier occasion and the testimony from a licensed optometrist, Doctor Kramb, which will be referred to in connection with the second of two assignments of error.

■ The first assignment relates to the admission of certain statements made by defendant both before and after his arrest.

Defendant's opening brief was submitted before the second *Dorado* decision was filed (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) and it is perhaps understandable that his complaints about the admission of his extrajudicial statements are rather general.

The prosecution introduced several groups of statements, given by defendant at various times. In order to understand our holding it is necessary to set forth in some detail the contents of the statements and the circumstances under which they were obtained.

The first group of statements introduced by the prosecution was given by defendant to Officer Brown of the Monrovia police, one of the investigating officers. On the day after the burglary, he had a conversation with defendant in the parking lot of the Rosemont Motel where defendant lived. The reason why he had decided to interview defendant at that time is not quite clear, though it seems probable that he had traced the automobile seen by Mrs. Sherer to him. Defendant was not in custody at the time. He made the following statements to the officer: 1. The automobile in question belonged to him; 2. The automobile was not near the scene of the burglary the day before; 3. At 12:15 p.m. on the day before, he was working in one of the apartments that he owns in the area; 4. His daughter could back him up on this; 5. No one else drove his car on the day before.

Officer Brown then told defendant what crime he was investigating and asked him to come to the police station, which defendant did, driving his own car and being followed by the police car. At the station there was further conversation, during which defendant denied having been at the trailer park in question on the day before and denied knowing Mrs. Lovell. He also denied ever having been in a trailer located near the sidewalk, as was Mrs. Lovell's; the only trailer he admitted having ever been to was one occupied by a Mr. Mackay, which was further inside the park.

A little while later that day defendant was arrested. After his arrest he talked to Officer Brown and Officer Fairbanks.

He again denied ever having been at Mrs. Lovell's trailer, but this time the location was not put to him. Being informed that furs had been taken, he asked what use he would have for a bunch of ratty old furs.

Later that day defendant was released on bail. During a conversation with Officer Brown and the bail bondsman defendant said, apparently quite spontaneously: "Brown, I didn't steal those furs but I can probably find out, and I will get them back."

The record is not as clear concerning the facts upon which the admissibility of a voluntary statement by a defendant depends as it would be had the parties tried the case with foreknowledge of *People* v. *Dorado, supra.* It is quite obvious, however, that all statements made to Officer Brown at the motel and two statements made at the police station were made before appellant was under arrest.

We have previously held that a conviction should not be reversed because of the admission of statements which might violate the *Dorado* rule, where the record does not show that the investigation had begun to focus on a particular subject. (*People* v. *Guastella,* 234 Cal.App.2d 635 [44 Cal.Rptr. 678].)[1] While it is true that the conversation at the parking lot and the later conversation at the police station did not precede the arrest by any considerable length of time, there is nothing here to show that this might  be a situation where the police purposely delayed the arrest in the belief that damaging statements might be harder to come by after the suspect was in custody. If it were, we well might have a different problem. Whether or not the investigation has begun to focus on a particular suspect should be determined by an objective standard, just as the purpose of interrogation is judged by an objective standard under the rule announced in *People* v. *Stewart,* 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]. This appears to be the practice followed in England. (See footnote 2, concurring opinion in *People* v. *Garner,* 57 Cal.2d 135, 161 [18 Cal.Rptr. 40, 367 P.2d 680].)

The phrase "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect . . ." was coined by the Supreme Court in *Escobedo* v. *Illinois,* 378 U.S. 478, 490 [84 S.Ct. 1758, 12 L.Ed.2d 977]. It must be understood in the light of that case.

---

[1]In *Guastella* we referred to the availability of habeas corpus in cases where in fact the accusatory stage had been reached, but the record on appeal did not show it.

In *Escobedo,* when the defendant's confession was obtained, to quote the court again, ''Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt . . . . At the time of his arrest and throughout the course of the interrogation, the police told petitioner that they had convincing evidence that he had fired the fatal shots.'' *Ibid.,* page 85. The circumstances of the prearrest conversations with defendant here certainly fall far short of those in *Escobedo.* All that appears from the record before us is that the police had traced an automobile seen by a witness to defendant. There is nothing to show that the damning evidence of the fingerprints was in their possession at that time. The inconsistency between defendant's denial of ever having been in Mrs. Lovell's trailer and his explanation for the fingerprints did not become apparent until the trial. This in truth is the only statement made before his arrest which must have affected his defense adversely.[2]   Thus while the police apparently had no one else to suspect during the prearrest investigation, it can hardly be said that the rays of suspicion had focused on defendant. At most he stood within a diffused beam of light. The crime was still unsolved.

■   Just what the police learned between the prearrest conversations at the motel and at the station and the actual arrest we do not know. Possibly defendant was visually identified by Mrs. Sherer, possibly the fingerprint identification came to light or possibly the police did not have probable cause to make the arrest.   If the last is the case the People will not be heard to say that as to any statement made after the arrest, the investigation had not focused on defendant; (*People* v. *Stewart, supra,* at p. 577) but defendant's trouble with regard to any statements made by him after the arrest, is that they did not hurt him at all, were cumulative of prearrest statements or entirely spontaneous and thus *not* within the *Dorado* rule. The new denial of ever having been in Mrs. Lovell's trailer was cumulative and, besides, not as damaging as the denial made before the arrest, because the location was not mentioned. It was therefore not inconsistent with the story about bringing a Christmas present to Mackay. The reference to ''ratty old furs'' was made after he was informed that furs had been stolen and, as far as we can tell, Mrs. Lovell's furs were neither ratty nor old. The state-

---

[2]At the trial defendant presented testimony to the effect that his fingerprints found their way onto Mrs. Lovell's trailer when he delivered a carton of cigarettes as a Christmas present to Mackay who had temporarily occupied the trailer until shortly before Christmas, 1963.

ment to Officer Brown in the presence of the bail bondsman was, of course, spontaneous and entirely unsolicited.

We find no reversible error in the admission of any statement by defendant.

The second assignment of error relates to the refusal to permit the optometrist, Doctor Kramb, to answer a hypothetical question. The circumstances were these: It was established that Mrs. Sherer was wearing trifocal lenses when she purported to have read the license number of defendant's car through a screened and louvered window. The car then was between 85 to 100 feet away from her and just beginning to move. It was a sunny day; she was looking more or less in a southeasterly direction; the sun was due south and, it being early in January, comparatively low over the horizon. Trifocals are worn generally by persons over 50 years because of their difficulty in focusing when shifting the vision from one distance to another. The upper portion of trifocal lenses is the one appropriate for distance vision. Counsel for defendant then asked a question which requested the doctor to assume the position of the sun, the car parked where it was when Mrs. Sherer saw it and a person wearing trifocals standing in the trailer looking toward the car through the screened, louvered window. The question was whether in the doctor's opinion such a person could see the license plate, meaning, of course, whether he could read the number. The doctor did not answer the question but said that he did not have enough data. He would want to know the condition of the license plate and whether it was clean or dirty, which would affect the "brightness contrast." He illustrated what he meant. He also asked for an assumption concerning the angle of the license plate on the bumper to be included in the question, but it then appeared that he had personal knowledge of that factor. Finally and fatally to defendant's position he said: "Then the ability of the individual observer to focus upon this distant vision object would enter the question, the observer's visual acuity." There was further talk about whether it would make any difference whether the car was stationary or in motion, the question was repeated, objection was made on the basis that the hypothesis put to the doctor did not include the visual acuity of the individual involved, the court added its own observation that there was no assumption made concerning the condition of the license plate and the objection was sustained. On cross-examination the prosecutor, though he had won his point, asked further

questions which, together with the answers, sought to emphasize the point that in order to answer the unanswered question the visual acuity of the individual would have to be known. Then there followed some inconclusive sparring between counsel concerning the possibility of Mrs. Sherer's vision being tested by the doctor and the matter was dropped.

Unless the doctor was prepared to say that no individual could read the numbers on a California license plate under the circumstances in question—and there is no hint from his testimony to that effect, nor was an offer of proof made—the court's ruling is obviously correct.

Hypothetical questions must not omit elements necessary to an intelligent opinion of the witness. Here the witness himself pointed to two elements which were not covered by the question. Common sense tells us that he was correct. (*Citron* v. *Fields,* 30 Cal.App.2d 51, 58-59 [85 P.2d 534]; *Bickford* v. *Lawson,* 27 Cal.App.2d 416, 428 [81 P.2d 216].)

The judgment is affirmed.

Shinn, P. J., and Ashburn, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 13, 1965.

---

*Retired Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.