[Crim. No. 10189. Second Dist., Div. Four. May 5, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ELLIOTT SHEPPARD, Defendant and Appellant.

Jerome S. Billet, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Harvey D. Unrot, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—After a trial by jury, defendant was found guilty on all five counts of an information charging him as follows: count I—kidnaping for the purpose of robbery, in violation of section 209, Penal Code; count II—robbery, in violation of section 211 of the Penal Code; count III—rape, in violation of section 261, subdivision 3 of the Penal Code; count IV—grand theft, in violation of

section 487, subdivision 3 of the Penal Code; and count V—assault with a deadly weapon, in violation of section 245 of the Penal Code. He was sentenced to state prison for life without possibility of parole on count I, and to state prison for the term prescribed by law on the other four counts, the latter sentences to run concurrently with that on count I. He has appealed.

On December 11, 1963, at about 3 p.m., the victim started to enter her automobile, parked in the parking lot of a shopping center. A Negro man approached her, threatened her with a gun, ordered her to move to the passenger's seat, took her car keys and drove the car away. After demanding her money, the man drove to a dead-end street, compelled his victim to remove her capri pants and underwear and raped her. He then allowed her to dress, drove her for about a mile and a half, and then allowed her to leave the car. He had taken $3 from the victim and drove off with her car. The victim promptly notified the police.

At about 8 p.m., of that day, defendant was apprehended by the police driving the stolen car. A search of the car disclosed a loaded revolver, later identified as similar to that used in the offense, and some other articles.

After his arrest, defendant was interrogated several times by police officers; no warning of constitutional rights was given until some time the next afternoon and after most of the statements herein significant had been elicited. In his several statements, defendant claimed to have borrowed the car from a friend named Ronald Sites; he denied any knowledge of the gun. At a later time, and after ownership of the revolver had been traced to him, he changed his story in part to that which he told on the witness stand. The ultimate story was as follows: He had purchased the revolver but had loaned it to Sites. On the evening of December 11th, defendant was standing on the sidewalk when Sites drove up in the car in question and invited him to go for a ride. While riding, they saw, and picked up, a feminine acquaintance of defendant. The young lady desired transportation to another part of town. Sites loaned defendant the car for that purpose, telling defendant to pick him up an hour later at a specified location. Defendant was arrested shortly after he had begun his errand of chivalry. When Sites picked defendant up, he saw the revolver in the car; Sites placed it under the front seat where the officer later found it. At the trial, Sites, testifying under the name of Arthur Wilson, corroborated defendant's final

story, admitting the car theft, but denying the robbery and the rape.

I

 Since the record is silent as to any warnings being given defendant at the time of the first five sets of interrogations, it must be assumed that none were given (*People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97]). The interrogation on December 12th stands, on this record, in no better position. The testimony on that subject consisted of the single, conclusionary, statement by Officer Blair that ''The defendant after being taken to the interrogation room at the police department was advised of his Constitutional rights . . .'' Whatever meaning such a statement might have in a case tried after the decision in *Dorado* and not objected to, we cannot assume that, in December 1963, Officer Blair had the prescience to anticipate the rules later to be announced in *Escobedo* v. *Illinois* and amplified by our Supreme Court in *Dorado*. Since we are left in the dark as to what constitutional rights the officer thought, in 1963, were pertinent, the record does not allow us to assume that even the December 12th statement was obtained after a proper warning.

Understandably, in light of the date of the trial, which preceded *Escobedo,* the record sheds little light on whether or not the requisites for the application of *Dorado* were met when the earlier ''conversations'' were held. Clearly, defendant was in custody, since the officers arrested and handcuffed him immediately after he was stopped and prior to any conversations at all. But, at that time, the officers knew only that he was driving the victim's car and that he fitted the general description — a tall Negro — which was the only description of the criminal given to them. Under these circumstances, some questioning of an investigatory nature could well have been in order. On the other hand, the officers did not accept defendant's denial of knowledge of the gun, nor his version of innocent possession of the vehicle. And some of the questions asked were so framed as to at least suggest that they were designed to secure incriminating admissions. The questioning that took place at the police station and later was clearly after the investigatory stage had been passed. We conclude that, as in *People* v. *Davis* (1967) 66 Cal.2d 175 [57 Cal.Rptr. 130, 424 P.2d 682], the record does not show that the People have maintained the burden

cast on them to prove that the police interrogation did not violate the rules of *Dorado*.

However, the several statements were all exculpatory in nature and in intent. Except for the statements concerning the gun, they were harmless. ▮ But the fact that defendant told three different stories about his knowledge of the gun, two of them admittedly false, was relied on as showing consciousness of guilt. Such statements are in the nature of admissions and call for a reversal only if it was prejudicial to admit them. (Cal. Const., art. VI, § 13.▮) Even though the case was tried before the decision in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and thus involves only the rules laid down in *Dorado* (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal. Rptr. 293, 423 P.2d 221], still, under the requirement imposed by *People* v. *Talley* (1967) 65 Cal.2d 830, 840 [56 Cal. Rptr. 492, 423 P.2d 564], the test for prejudicial error is that set forth in *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824]—namely whether or not we can conclude that the error was harmless beyond a reasonable doubt.

We conclude that, applying that test, the error was not prejudicial. Defendant's ultimate story, supported by that of Sites-Wilson, gave a reasonable explanation of defendant's motives in trying to disassociate himself completely from the gun. Had the jury believed Sites, it would not have been worried about the original disclaimer; but it believed the victim and not Sites. Nor was the story told at the trial induced by the original denial of ownership; the final version was impelled by the testimony that defendant owned the gun—a fact which the police would and could have developed even if defendant had exercised his right to remain silent.

II

▮ Defendant was not only convicted on all five counts but was sentenced on all five. But, since all five crimes were clearly part of a single episode, only one sentence could lawfully be imposed (Pen. Code, § 654), and, under section 669 of the Penal Code, that sentence must be the life sentence provided for by section 209.

The sentences imposed on counts II, III, IV and V, are vacated; otherwise the judgment is affirmed.

Files, P. J., and Jefferson, J., concurred.