[Crim. No. 6134. First Dist., Div. Four. Mar. 29, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. SOTERO ROSENDO GIOVIANNINI, Defendant and Appellant.

Donald W. Haynes, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Jerome C. Utz and James A. Aiello, Deputy Attorneys General, for Plaintiff and Respondent.

CHRISTIAN, J.—Having been found guilty by a jury, defendant appeals from a judgment of conviction of murder in the first degree (Pen. Code, § 187) with a penalty of life imprisonment.

On Sunday, July 19, 1964, Virginia Mae Cothern was working as a barmaid at the Sidewinder Bar in El Monte. When Fred Baker, the owner of the Sidewinder, left at 7:30 p.m., several customers were drinking at the bar. He told Miss Cothern to close at about 10, the normal Sunday closing time. At approximately 9 p.m., Richard Lopeman and five others arrived at the Sidewinder.

Appellant and Miss Cothern were the only ones present when Lopeman and his group arrived. The newcomers went to the back dining area and began to sing and drink beer. A while later Miss Cothern brought appellant over and introduced him to Lopeman and his cronies. Appellant joined in the singing and conversation. Since no other customers were at the bar, Miss Cothern spent most of her time with the singers. On one occasion she sat on appellant's lap and appellant put his arm around her waist. Appellant seemed to have had less to drink than the others. At 10 o'clock, Miss Cothern announced that it was closing time. Lopeman and his friends departed. On his way out, Lopeman talked briefly with appellant. Thereafter appellant and Miss Cothern were left alone in the bar.

When Baker arrived at the Sidewinder the next morning, Mary Kern, Miss Cothern's roommate, was waiting outside. Baker noticed that the outside light and window lights were still on. Entering the bar, he saw that the place was not cleaned up and that the back door was not closed. In the dining area, he found Miss Cothern's nude body lying in a considerable amount of blood. The cash register was empty, and some loose change was scattered on the floor. Baker estimated that $115 to $120 was missing.

After the police arrived, it was noticed that there were footprints in the fluids surrounding the body and on the body itself. The causes of death were strangulation and a stab

wound in the neck, which caused profuse hemorrhage. There was evidence of sexual molestation. A pair of sunglasses, an empty Marlboro cigarette pack and a broken ball point pen were found near the body.

Lopeman, upon hearing of the homicide, offered to help the police. As he was an accomplished artist, he prepared a sketch of the last person in the Sidewinder on July 19. The sketch showed a person wearing a goatee. On five occasions Lopeman went to the police station to look at suspects. None was appellant.

Police Sergeant Wrona led the investigation. He published Lopeman's sketch of the suspect, and as a result numerous leads were received. A few days after the crime, appellant's aunt called and told Sergeant Wrona the published sketch resembled her nephew. Sergeant Wrona did nothing about this call; he was busy with other leads. The officers investigated at least one hundred suspects. On Friday, August 28, Sergeant Wrona finally called appellant and asked him to come to the station to talk about what occurred at the Sidewinder on July 19. Appellant said he knew what the sergeant was referring to, and said he would come right down.

When appellant first arrived at the station, Sergeant Wrona asked for appellant's name and address and got a physical description. He observed that appellant did not have a goatee. Lopeman was summoned to the station; he signalled covertly to Sergeant Wrona indicating that appellant was the man Wrona had been searching for. Appellant had already admitted that he had been singing with a group of men at the Sidewinder on July 19. Appellant said he heard about the murder the next day.

Sergeant Wrona then invited appellant into the kitchen for a cup of coffee and asked him to relate what happened on July 19, 1964. Appellant stated that he went to the Sidewinder at 7 p.m. on July 19. Other customers were present at this time; one drunk had an argument with Miss Cothern over an alleged shortchanging. Later appellant was invited to sit with a group singing in the back dining area. On one occasion the victim sat on his lap. When the victim announced that it was closing time, the others left and appellant was alone with her. He noticed that he had lost his sunglasses, a pen or pencil, and a Marlboro pack. When the victim went into the dining area, he left. He went for a long walk in the area, returned home and went to bed.

Later in the day Sergeant Wrona and the appellant, accom-

panied by Sergeant Human, went to an interview room, where appellant related the same story to Sergeant Human that he had previously told Sergeant Wrona, adding that he owned a 1956 Ford. At this time he was not under arrest. At the officer's request, appellant showed them both his shoes. The officers immediately saw that the pattern on the soles resembled the prints found in the fluids near the body. Laboratory examination later revealed that appellant's shoes probably did make the footprints near the body.

The officers then asked him to "tell us just what happened at the Sidewinder Cafe on Sunday night." Appellant replied that when he heard the next day that Virginia Cothern had been choked he realized that he had strangled her. While she was counting the money, he had gone behind the bar and grabbed for her neck. In an ensuing violent struggle her clothes had been torn off. After stabbing and choking her, he wrapped some clothing around her, took the money and left. At home he noticed some debris on his pants; he removed them, left his home and, walking past a lot where some cars were parked, placed the pants in a Buick or Oldsmobile. He purchased a Ford convertible with the money he had taken. It was not until this point that appellant was informed of his right to an attorney and to make a telephone call, and placed under arrest. Sergeant Wrona testified that all the statements were made voluntarily but that once Lopeman identified appellant as being the last person in the Sidewinder on Sunday night, he (Sergeant Wrona) would not have let appellant leave the station without first obtaining his account of what occurred.

All of Sergeant Wrona's testimony regarding the content of appellant's statement, and the circumstances in which it was given, was heard by the judge out of the presence of the jury. The judge concluded that the investigation focused on appellant as a prime suspect when the officers saw that appellant's shoes appeared to be the ones that had made the prints at the scene of the crime. Therefore, under *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], the accusatory stage was reached at that point. Thus Sergeant Wrona was permitted to relate to the jury only statements made by appellant prior to the examination of his shoes. The judge also struck some testimony which had already been received relating to the condition of appellant's pants, as the discovery of the pants was the fruit of an inadmissible portion of the statement.

 Appellant's first contention is that the prosecutor commented on appellant's failure to testify and that a reversal is therefore required under *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229]. Although the trial took place a few weeks before *Griffin* was decided by the United States Supreme Court, the prosecutor, perhaps anticipating that the California rule allowing comment upon the silence of the accused was likely to be disapproved, indicated to the court and defense counsel that he did not intend to make such comment in his argument. However, he did argue the evidence vigorously and at length; it is contended that by clear implication he invited the jury to draw an inference of guilt from appellant's exercise of his constitutional privilege to remain silent.

Although many convictions have been reversed for impermissible comment, none has specifically defined what *Griffin* comment is. For example, in *People* v. *Odom* (1965) 236 Cal. App.2d 876 [46 Cal.Rptr. 453], the court, not quoting any statements, reversed a conviction because the "prosecution commented extensively on Odom's failure to take the stand." (236 Cal.App.2d at p. 880.) In *People* v. *Montigo* (1967) 248 Cal.App.2d 32 [56 Cal.Rptr. 33], the defendant contended that although the prosecution did not comment directly on defendant's failure to testify, the statements inferentially called the jury's attention to defendant's refusal to testify. Specifically the prosecutor said "There's no explanation for" defendant's possession of the stolen property. The court held that although the comment was close to a violation of *Griffin*, it actually related to the state of the evidence before the jury. The concept of a fair trial required that counsel be permitted to fully discuss the evidence, drawing all reasonable inferences therefrom. The court recognized that there is no clear line of demarcation between *Griffin* comment and legitimate comments on the evidence. "If *Griffin* were to be pushed to its dry, logical extreme, the right to argue the effect of evidence when a defendant refuses to testify would be nearly nullified by attenuated subtleties." (248 Cal.App.2d 38.) The court suggested that legitimate comment must relate to the evidence and to inferences logically drawn therefrom.

In *People* v. *Beghtel* (1966) 239 Cal.App.2d 692 [49 Cal. Rptr. 235], the court said the purpose of *Griffin* is to prevent a citizen's exercise of a constitutional privilege from being judicially emphasized as affirmative evidence against him. Thus statements such as "An opportunity was given him for

604

explanation; he gave none" were held to be arguments on the sufficiency of the evidence. In *People* v. *Erickson* (1967) 254 Cal.App.2d 395, 401 [62 Cal.Rptr. 108], the prosecutor argued " 'in view of the fact that [the] testimony is uncontroverted and uncontradicted, . . .' " Defendant contended *Griffin* error. *Griffin*, said the court, did not require the prosecutor to abstain from stating that testimony is uncontradicted. ■ A prosecutor's comment that testimony describing criminal conduct of a defendant is uncontroverted, is not, itself, a comment on defendant's failure to testify. In *People* v. *Modesto* (1967) 66 Cal.2d 695 [59 Cal. Rptr. 124, 427 P.2d 788], the prosecutor in referring to the defendant said, "You know who he is. He is sitting here in the courtroom—and just sitting." (66 Cal.2d at p. 711.) There were also many statements that defendant's attorney had testified. (See 66 Cal.2d 710, fn. 11.) The court held the latter statements did not violate *Griffin* but the former did. In commenting on the improper statement, the court said:

"Although the comment now before us leaves more to the jury's imagination than did the remarks which the *Griffin* court held unconstitutional, we cannot ignore the transparent implications of the words chosen by counsel for the prosecution in the instant case. The rulings of the courts should not be so esoteric that a judgment must turn on the superficial difference between this prosecutor's phraseology and that found improper in *Griffin*." (66 Cal.2d at p. 711.)

■ Here the defense had rested without presenting any evidence. The prosecutor pointed out many times in the course of a lengthy argument that various points made in the People's case had gone without contradiction. The total purport of these observations is fairly summarized in the following quotation from the argument:

"Again, we have the situation where the State has presented very persuasive evidence that the defendant did murder her, as I have repeatedly described that he did, and there is no challenge, no testimony whatsoever to refute that."

These comments were proper; they "relate to the state of the evidence before the jury and not to defendant's failure to take the stand and testify." (*People* v. *Montigo, supra,* 248 Cal.App.2d 32, 38.) ■ But in other passages of the argument we find implied invitations to the jury to draw inferences damaging to the defense, not from the general state of the evidence but specifically from appellant's failure to present himself as a witness. Thus the prosecutor declared:

"Of the several voices that we could hear in this case, one voice has been forever stilled. We will not hear from her." The other voice, of course, was that of appellant who, according to the prosecution's theory, was the only other person present at the time of the murder. Then, in reference to the portion of appellant's admission to Sergeant Wrona which had been received in evidence, the prosecutor stated: "The defendant, in his own words spoken to Sergeant Wrona, there is no denial of those words, *with the defendant present,* . . ." (Italics added.) Similarly, in another passage, the prosecutor said: "Now, as far as how the bottle was broken . . . there would be two people, possibly, who could answer that, and one of them, of course, is dead." These comments are similar to the comment held to be objectionable in *People* v. *Modesto, supra,* 66 Cal.2d 695, 711: "Who is the only person around who had blood on him, besides the two little girls? You know who he is. He is sitting here in this courtroom—and just sitting." We cannot say here, as did the Court of Appeal in *People* v. *Montigo, supra,* 248 Cal.App.2d 32, 38: "It is true the jury might well have concluded that by failing to take the stand and explain these peculiar circumstances defendant opened the way for an inference of guilt. The inference, however, would be that of the jury, not one argued to them by the prosecuting attorney. . . ."

*Griffin* error does not require reversal of a judgment if the court is "able to declare a belief that it was harmless beyond a reasonable doubt." (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 711, 87 S.Ct. 824].) As the California Supreme Court pointed out in *People* v. *Modesto, supra,* 66 Cal.2d 695, 712, it is necessary to "distinguish the impact of the defendant's *silence* from the impact of the prosecutor's *comment* upon that silence; if we were concerned with the former rather than the latter, we could not disregard the devastating effect in the present case of the defendant's failure to take the stand." Here the case against appellant was strong. He was the last person shown to have been with the victim before the crime; personal articles belonging to him were found at the scene; there was circumstantial evidence of a sexual motivation; and a footprint probably made by appellant's shoe was found in fluid residue near the body. The effect upon the jury of observing appellant's silence during several days of this kind of testimony was clearly overwhelming. The jurors were given nothing, beyond the presumption of innocence, upon which to build any reasonable doubt of the

guilt so strongly pointed to by the evidence. Moreover, where the evidence indicated that no one other than appellant and the victim were present at the Sidewinder after the bar closed, the members of the jury can hardly have avoided taking appellant's silence as amounting almost to a concession that the prosecution's reconstruction of the murder was correct. In these circumstances, the implied and indirect references to appellant's exercise of his constitutional privilege to remain silent, which we have quoted above, cannot within any reasonable degree of possibility have contributed to the result. The comments were unnecessary; under the test announced in *Griffin* v. *California, supra,* they are retrospectively seen to have been improper; we conclude that they were nevertheless not prejudicial. (*People* v. *Erb* (1968) 259 Cal.App.2d 159 [65 Cal.Rptr. 274].)

██ Appellant complains of the giving of an instruction based upon form instruction number 51 in the work, California Jury Instructions, Criminal. The form has been obsolete and erroneous since *Griffin.* (*People* v. *Davenport* (1966) 240 Cal.App.2d 341, 347 [49 Cal.Rptr. 575].) But the instruction was requested by appellant; thus he cannot now claim error. (*People* v. *Nye* (1965) 63 Cal.2d 166, 173 [45 Cal.Rptr. 328, 403 P.2d 736].) Moreover, the judge, apparently anticipating the *Griffin* holding, correctly modified the form by deleting language suggesting that inferences adverse to the defendant might be drawn from his failure to testify. We find no error in the instructions.

██ Appellant's next contention is that, under *People* v. *Dorado, supra,* 62 Cal.2d 338, the court erred in receiving admissions made by appellant to Sergeant Wrona before appellant was advised of his rights and after the investigation had begun to focus on appellant. The defense made timely objection to the reception of any part of the admissions. It was clear to the trial judge both that appellant's initial admission of knowledge of the crime made over the telephone to Sergeant Wrona did not come within *Dorado* prohibitions and that the ultimate full confession, made under interrogation in the police station and without any statement of rights having been given, was to be excluded. The judge therefore properly (see *People* v. *Schader* (1965) 62 Cal.2d 716, 727 [44 Cal.Rptr. 193, 401 P.2d 665]) took evidence at length, out of the presence of the jury, to determine accurately the point during Sergeant Wrona's interview with appellant · when, under *Dorado,* a statement of rights should have been given

because the investigation had begun to focus on appellant, appellant was in custody, and the interrogation had taken on a character that lent itself to eliciting incriminating statements. (See *People* v. *Stewart* (1965) 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97], affd. *sub nom., Miranda* v. *State of Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

We find in the cases no clear-cut test for determining when an investigation has ceased being a general inquiry into an unsolved crime and has begun to focus on defendant. Appellant, relying on *People* v. *Chaney* (1965) 63 Cal.2d 767 [48 Cal.Rptr. 188, 408 P.2d 964], *In re Varnum* (1965) 63 Cal.2d 629 [47 Cal.Rptr. 769, 408 P.2d 97], and *People* v. *Jackson* (1965) 236 Cal.App.2d 791 [46 Cal.Rptr. 541], contends that as a matter of law he had become the prime suspect before he made any statements. But in *Chaney,* before the defendant arrived at the sheriff's office he was "substantially implicated" in the crime. At the sheriff's office, he surrendered identifiable, stolen articles. The court concluded that any further investigation of defendant could not be a general inquiry into an unsolved crime. In *Varnum* the Supreme Court held that when defendant admitted, two days after his arrest, that he was involved in the crime the investigation had begun to focus on him. In *Jackson* defendant was asked, two days after his arrest, to tell the officer everything he did; he then confessed. It was held that the accusatory stage was reached prior to defendant's confession.

In the present case Officer Wrona had checked more than 30 suspects in a little over a month. He was primarily interested in locating the person who resembled Lopeman's sketch. In looking through his records, he realized he had not followed up the call from appellant's aunt. He called appellant and invited him to the station. The investigation thus had not focused on appellant when he replied over the telephone that he knew of the murder. When appellant first arrived at the police station he admitted being at the Sidewinder on July 19. Many others had also been there and there was still no cause to focus suspicion on appellant. When Lopeman identified appellant as the last person known to have been in the Sidewinder other than the victim, it did not mean that appellant necessarily committed the crime; but it did establish in the officer's mind appellant's identity as the prime suspect he had been searching for so laboriously. The investigation focused on appellant at that moment. Thus, in our view, the

608

facts do not support the conclusion of the trial judge that the investigation had not focused and that Sergeant Wrona was continuing his general investigation of an unsolved crime.

We cannot say, however, that the second *Dorado* element (custody) came into play as a matter of law at that point. Sergeant Wrona asked appellant to have a cup of coffee and tell him what happened. ▮▮ It is not necessary for a person to be under arrest for him to be in custody. Even one who comes to a police station voluntarily may be regarded as in custody. (*People* v. *Arnold* (1967) 66 Cal.2d 438, 445-448 [58 Cal.Rptr. 115, 426 P.2d 515]; *People* v. *Kelley* (1967) 66 Cal.2d 232, 246 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *Furnish* (1965) 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299].) In *Arnold* the court held that "custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived." (*Ibid.* at p. 448.) The emphasis is not on the interrogator's subjective intent but on whether defendant, by virtue of his situation, reasonably believes his freedom of movement is restricted by pressures of physical authority. (*People* v. *Kelley, supra,* at p. 246.) ▮▮ Here appellant was not under arrest at the time the statements were made. Sergeant Wrona did testify that once Mr. Lopeman identified appellant, he would not have allowed him to leave the station without first telling them what he did on the night of July 19. But appellant appeared at the station voluntarily; he was invited for coffee in the police kitchen; there he told Sergeant Wrona his exculpatory story. It is doubtful whether appellant believed, at this time, that his freedom was restricted.

Sergeant Wrona and Sergeant Human then took appellant to an interrogation room in the police station. Thereafter, when appellant had been at the police station about two hours, the examination of appellant's shoes took place. The trial judge concluded that the investigation had not focused upon appellant so as to bring *Dorado* into play until the shoes were identified. We have already indicated why the evidence compels the conclusion that focus occurred earlier, when Lopeman identified appellant. We consider it highly likely that the second *Dorado* element, custody, came into play when the amenities of coffee drinking and preliminary conversation ended and appellant was taken by the two officers to the interrogation room; appellant must by then have believed, "as a reasonable person" that his freedom of action was restricted, as in *Arnold*.

■ To determine if the police are carrying out a process of interrogations that lends itself to eliciting incriminating statements, so as to fulfil the third *Dorado* prerequisite, the court must analyze such factors as the length of the interrogation, place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances. (*People* v. *Stewart* (1965) 62 Cal.2d 571, 579 [43 Cal.Rptr. 201, 400 P.2d 97]; see also Graham, *What Is "Custodial Interrogation?"* 14 U.C.L.A.L.Rev. 59.) Generally California cases have held that where questioning occurs at the police station, the suspect is being interrogated. (*People* v. *Kelley, supra,* 66 Cal.2d 232; *People* v. *Grubb* (1965) 63 Cal.2d 614 [47 Cal.Rptr. 772, 408 P.2d 100].) Sergeant Wrona did not devise leading questions to elicit admissions from appellant as was done in *People* v. *Arnold, supra,* 66 Cal.2d at p. 449. There is nothing to indicate that Sergeant Wrona was employing psychologically coercive methods on appeal to wring a confession or damaging admissions from him. Nevertheless, because of the combined circumstances, it may be that as a matter of law the interrogation came within the *Dorado* requirements not later than the point at which the officers took appellant into the interrogation room. But no such holding is required, because no significant statement made by appellant after that point was admitted by the judge.

■ There was substantial conflict in the evidence, and in the inferences to be drawn therefrom, as to the situation which prevailed before appellant was taken to the interrogation room. It was the responsibility of the trial judge to resolve such conflicts and uncertainties and he did so after an elaborate hearing conducted out of the presence of the jury. His determination finds reasonable support in the evidence; therefore, it is not to be disturbed upon appeal. (Cf. *People* v. *Wood* (1967) 250 Cal.App.2d 911, 919 [59 Cal.Rptr. 317]; *People* v. *Stafford* (1966) 240 Cal.App.2d 422, 424 [49 Cal. Rptr. 598] [in which the substantial evidence rule was applied to the trial court's determination that a suspect had waived his *Dorado* rights].)

■ Appellant contends that the court erred in receiving in evidence a pair of blood-stained pants which were discovered as a result of information which came to police as part of appellant's inadmissible confession. The defense did not bring the point to the trial court's attention by appropriate objection when the evidence was offered; nevertheless the

court did, upon a later motion strike, and admonish the jury to disregard, all evidence having to do with the pants. At the same time the court directed the prosecutor not to refer to the stricken evidence in his closing argument. ▮ The court thus correctly anticipated the holding of the California Supreme Court, in *People* v. *Buchanan* (1966) 63 Cal.2d 880, 887 [48 Cal.Rptr. 733, 409 P.2d 957], that physical evidence secured as a result of a statement obtained in violation of *Dorado* requirements is to be excluded. ▮ Appellant's counsel acquiesced in the court's handling of the problem; there was no motion for mistrial. We find no error. A related contention is that the court should not have admitted evidence that appellant purchased an automobile for $98.50 one day after the murder; again it is contended that the police obtained this information as a result of the inadmissible confession. But at this post-*Dorado* trial, appellant did not object to the introduction of the evidence in question. ▮ Failure to object to the introduction of evidence obtained in violation of *Dorado* requirements precludes appellant from raising the issue on appeal. (*People* v. *Larke* (1966) 246 Cal.App.2d 571, 575 [54 Cal.Rptr. 834]; *People* v. *Hansard* (1966) 245 Cal.App.2d 691, 697 [53 Cal.Rptr. 918].)

▮ In his opening statement the prosecutor referred to appellant's purchase of the car one day after the murder, appellant's statements made to the officers, and appellant's blood-encrusted pants. It is now contended that these comments constituted error because the pants, statements and reference to the car were inadmissible. The pants and part of the statements were excluded by the court, but evidence concerning the purchase of the car was received without appropriate objection. There is no indication that the prosecutor was guilty of bad faith in mentioning matters which later were excluded by the court. Generally comment in an opening statement on evidence which is later ruled inadmissible is not reversible error. (*People* v. *Hurst* (1957) 151 Cal.App.2d 239 [311 P.2d 580]; *People* v. *Planagan* (1944) 65 Cal.App.2d 371, 407 [150 P.2d 927].)

▮ Finally, appellant contends that the prosecutor committed error by giving his personal opinion of appellant's guilt. In his closing argument the prosecutor stated: "But I do ask you to find it to be of great signficance that the People have presented *what I regard as such a conclusive case* in every respect and the defense has chosen to not present any evidence in contradiction." (Italics added.) California cases

have held that a prosecutor's statement, not based on legitimate inferences from the evidence, that he has personal knowledge of defendant's guilt or that he would not prosecute unless defendant was guilty, is misconduct. *People* v. *Modesto, supra,* 66 Cal.2d 695, 715; *People* v. *Alverson,* (1964) 60 Cal.2d 803, 808 [36 Cal.Rptr. 479, 388 P.2d 711]; *People* v. *Kirkes* (1952) 39 Cal.2d 719, 723 [249 P.2d 1]; *People* v. *Conover* (1966) 243 Cal.App.2d 38, 50 [52 Cal.Rptr. 172].) Here the statement, although not in keeping with good professional usage, was not as to the prosecutor's personal belief in appellant's guilt. The net effect of the statement was that all the evidence presented established a conclusive case. There was no objection by appellant; the point is thus lost, where any error could clearly have been cured by a timely admonition.

The judgment is affirmed; the appeal from the order denying motion for new trial is dismissed.

Devine, P. J., and Rattigan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 29, 1968. Peters, J., was of the opinion that the petition should be granted.