[Crim. No. 9014.   In Bank.   Jan. 25, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. NATHANIEL JACK BUCHANAN, Defendant and Appellant.

Nathaniel Jack Buchanan, in pro. per., Michael Cullen, under appointment by the Supreme Court, and Kenneth Cleaver, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J. — Nathaniel Jack Buchanan, McKinley Williams and Steve Williams were charged with the murder of Leon Coleman. At a joint trial the jury found Buchanan and McKinley Williams guilty of murder in the second degree. (Pen. Code, § 189.) Steve Williams was acquitted. Buchanan's motions for a new trial and to reduce the offense to manslaughter were denied. Buchanan appeals from the judgment.

The facts are as follows: On Saturday night, December 9, 1961, appellant and his two codefendants went to a dance given by a teenage social group at the Warehousemen's Union Hall in Los Angeles. They were accompanied by two girls, Ruth Locke and Jeri Lee Bradford. Leon Coleman was the night manager of the hall.

Coleman admitted the two girls to the dance free of charge. The dance was held on the second floor of the building. Shortly thereafter, when the girls came downstairs, Coleman invited them into his office, made improper advances, and implied that he would pay them for sexual favors. The girls rejected these suggestions. As Coleman and Jeri were leaving the office, he grabbed her around the waist. Appellant, who was standing with McKinley and Steve in the parking lot adjacent to the hall, saw this and knocked Coleman down with a slap. Someone else then hit Coleman on the head with a hammer. While Coleman was down, several boys jumped on him and began fighting.

Shortly after midnight, Officer Battles of the Los Angeles Police Department was called to the hall. He found Coleman unconscious with blood about the nose, ear, and chin area and a small hole surrounded by powder burns in the chest. There was no money in Coleman's pockets. A search of the area revealed no weapon, but a spent cartridge was found four feet from the body. Coleman died shortly thereafter. The cause of death was the gunshot wound in his chest.

The foregoing was the only evidence that was admitted against appellant, except for a statement he gave to the

police on December 14th, and a gun which was discovered at his mother's house as a result of that statement. As this evidence, without the statement, is obviously insufficient to sustain the guilty verdict against appellant, the admission of the statement and the gun into evidence, if erroneous, was clearly prejudicial to him. Indeed, at trial the deputy district attorney who tried the case conceded that unless appellant's statement were admitted, ''the case of the People against him collapses.''

In the statement in question appellant declared that on the night of the killing he was in the parking lot adjacent to the hall when he saw Steve Williams walk across the lot. He asked Steve what was happening. Steve replied, ''Jerry's [sic] over there talking to some man. Then McKinley got out of the car and came over to where me and Steve were and said he had to make him some money to pay his car note. I told him, 'Not here,' and he said he was going to pull his car around the corner. He pulled his car around the corner and Steve walked back to the car lot. . . . I walked up to the back entrance by the bathroom ready to go back inside and the man was pulling on Jerry trying to get her to go into some room back there. And I slapped the man and he fell down. When he fell down Steve came from around the cor-ner—somewhere back there—and hit him with a hammer. McKinley came up from somewhere and got to hollering, 'Get the money.' I reached in the man's pocket and took $16 out. Then the man was getting jumped on by 15 or 16 more little boys. I guess they were trying to help. I guess they thought the man was trying to mess with Jerry. Then I heard a shot and I jumped up and said, 'Who shot him, what you shoot him for?' McKinley said, 'He pulled on the gun.' I said, 'You are a damn fool, you ride your own beef.' I jumped up and ran around to the front of the building and McKinley pulled through the lot again and told me to come on and let's get out of here. And McKinley and Steve were in the car. We went to his house.''

Because McKinley was afraid of being caught with the gun, he gave it to appellant to keep. With respect to the $16 taken from Coleman, appellant said that he gave $11 to McKinley and kept $5.

At trial appellant objected to the admission of his state-ment into evidence on the ground that it was coerced. After hearing extensive and conflicting testimony on that issue, the trial court admitted the statement and gave the jurors proper

instructions to exclude it from their consideration if they found it was coerced. Because this case was tried in 1962, before *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], was decided, the court failed to apply the criteria established by *Escobedo* and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], before admitting the statement. ▮ The trial court's finding that the statement was not coerced obviously does not include the necessary findings that appellant was not improperly deprived of his right to remain silent and his right to counsel. (*People* v. *Schader*, 62 Cal.2d 716, 727 [44 Cal.Rptr. 193, 401 P.2d 665].) As stated in *Schader*, "The same difficulties which beset the admissibility of a confession procured by coercion pertain to the admissibility of a confession obtained in derogation of defendant's right to counsel. We do not know if the jury actually reached separate and definite conclusions as to (1) whether defendant . . . prior to confession, requested and was denied counsel, or (2) whether he was advised of his rights to counsel and to remain silent, or (3) whether he otherwise waived those rights. In such a situation we inevitably incur the danger that the jury might have returned 'an unanalytical and impressionistic verdict based on all they had heard.' (*Stein* v. *New York* (1953) 346 U.S. 156, 177-178 [73 S.Ct. 1077, 97 L.Ed. 1522]; see 78 Harv.L.Rev. (1964) 143, 211.)" (*People* v. *Schader, supra,* at p. 728.)

▮ Although appellant's statement was not a confession, and so was not prejudicial per se (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356), its introduction in this case, if erroneous, was clearly prejudicial either under the test announced in *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243], or the one announced in *Fahy* v. *Connecticut* (1963) 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171]. Its introduction, therefore, if erroneous, requires a reversal (*People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382]).

The facts in reference to the statement are as follows: Appellant was arrested early on December 10th, the morning after the killing. Officer Griffin of the Los Angeles Police Department testified that he "interviewed" appellant on Monday at noon. Griffin said he indicated to appellant that the police knew something about the shooting and told appellant that he wanted to hear his side of the story. He also asked appellant whether he had the gun. Appellant refused

to say anything more than that he had been at the dance. Griffin spoke to appellant again on Tuesday, the 12th, once in the afternoon for about 30 minutes and again at night. Griffin testified that during these sessions appellant said several times that he would rather not talk about the case and that he wanted to go home; and that on at least one of these occasions appellant asked for legal counsel.[1]

After the questioning on Tuesday evening, Griffin ordered appellant released because of lack of evidence. On Wednesday evening, after Griffin had spoken with McKinley and Jeri, appellant was rearrested. During an interrogation on Thursday morning, Griffin told appellant that the police knew what happened at the dance and that their investigation revealed that appellant was implicated more deeply in the crime than he had admitted. Within 10 to 20 minutes appellant gave the statement quoted above. This statement was tape recorded and also written out by a stenographer and signed by appellant. It was introduced into evidence.

Although appellant did not take the stand as part of the defense on the merits, he testified on *voir dire* that he told Griffin that he wanted to see a lawyer during the Monday interview, at the interview on Tuesday afternoon, and on Wednesday evening as he was being led into the police station; that Griffin refused to let him contact a lawyer and became hostile whenever appellant broached the subject; and that at the Monday and Tuesday interviews and again at the Thursday interrogation, prior to making his statement, he told Griffin that he did not want to talk. He made the statement, so he claimed, because of threats.

It is clear that the accusatory stage had been reached when the statement was secured. As appellant was under arrest, he was "in custody" and the investigation had "begun to focus" on him. (*People* v. *Stewart,* 62 Cal.2d 571, 577 [43 Cal.Rptr. 201, 400 P.2d 97].) Looking at "the length of the interrogation, the place and time of the interrogation, the nature of the questions, the conduct of the police and all other relevant circumstances" (*id.* at p. 579), it is clear that the statement was the product of a "process of interrogations that lends itself to eliciting incriminating statements." (*Escobedo* v. *Illinois, supra,* 378 U.S. 478 at p. 491.) Appellant had been taken to an interrogation room in the police

---

[1]Griffin's testimony is conflicting as to which day this request was made; at one point he said Tuesday but not Monday and at another point Monday but not Tuesday.

department for questioning by Griffin, and Griffin asked him specific questions about the crime as he had done during the previous interviews. Griffin ''set him up'' first by leading appellant to believe the police already knew about his participation in the crime. As all the requirements for the accusatory stage were met, appellant was entitled to be told of his rights to counsel and to remain silent. Failure to warn him of these constitutional rights was error.

There is no evidence that these constitutional rights were waived. The testimony of *both* Griffin and appellant indicates that, during at least one of the interviews of Monday and Tuesday, appellant requested counsel (although he could not have known that he had a *right* to counsel at that time, before *Escobedo* was decided). Appellant testified that he also asked for counsel after his rearrest before he made his statement, and Griffin's testimony does not show the contrary. If, on retrial, appellant is believed on this matter, the case comes squarely within *Escobedo,* the only difference being that defendant here apparently did not have retained counsel at the time he made the request, whereas Escobedo did. We have held that this is not a meaningful distinction. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 347.)

Even if it is *not* believed on retrial that appellant made a request for counsel after his rearrest, the record does not contain any other evidence on the waiver issue. ▮ As the United States Supreme Court has stated, ''Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.'' (*Carnley* v. *Cochran,* 369 U.S. 506, 516 [82 S.Ct. 884, 8 L.Ed.2d 70].) ▮ The fact that appellant had asked for counsel and chose not to make any statement during Monday and Tuesday sessions but may not have asserted these rights during the Thursday interrogation does not show that he knew his rights but decided to forgo them when he made his statement. Although during the earlier sessions he may have thought that he had a right to counsel (even though that right in state proceedings had not then been established), Officer Griffin's admitted refusals to permit him to obtain counsel might well have convinced defendant that he was wrong in this belief, or that continued assertions of his rights would prove futile. In these circumstances, to draw the conclusion that appellant (1) *knew* of his right to counsel and to

remain silent and (2) "intelligently and knowingly" (*Escobedo* v. *Illinois, supra,* 378 U.S. 478, 490 at fn. 14) decided to waive these rights would do violence to the rule that " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights." (*Johnson* v. *Zerbst,* 304 U.S. 458, 464 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357]; *In re Johnson,* 62 Cal.2d 325, 334-335 [42 Cal. Rptr. 228, 398 P.2d 420].) On retrial, if no more evidence (on waiver) is presented than was introduced in this trial, appellant's statement must be excluded.

It is obvious that, since the gun was secured by the police as a result of the statement obtained in violation of the rule of *People* v. *Dorado, supra,* 62 Cal.2d 338, it too should have been excluded as the "poisonous fruit" of the illegal statement. (Cf. *People* v. *Bilderbach,* 62 Cal.2d 757, 767-768 [44 Cal.Rptr. 313, 401 P.2d 921]; *People* v. *Ditson,* 57 Cal.2d 415, 439 [20 Cal.Rptr. 165, 369 P.2d 714]; *Wong Sun* v. *United States,* 371 U.S. 471, 485 [83 S.Ct. 407, 9 L.Ed.2d 441]; *Nardone* v. *United States,* 308 U.S. 338, 340-341 [60 S.Ct. 266, 84 L.Ed. 307].) This conclusion inevitably follows from the rule established in *Dorado.*[2]

The trial court, in its instructions, and the district attorney, in his final argument, commented upon defendant's failure to take the stand. This was error. (*Griffin* v. *California,* 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106].) However, because we reverse appellant's conviction under the

---

[2]In *People* v. *Robinson* (1963) 13 N.Y.2d 296 [246 N.Y.S.2d 623, 196 N.E.2d 261], the defendant was suspected of robbery and homicide. The police had him arraigned on a vagrancy charge, questioned him on two separate occasions respecting the robbery and the homicide, and then placed him in a cell for the night. Pursuant to a plan conceived by the police, a prisoner in an adjoining cell engaged the defendant in a conversation which was contrived to, and which did, elicit information divulging the place where guns had been concealed. ·These statements were not introduced at trial, although other damaging admissions made to the fellow prisoner were introduced. However, it was clear that without this information the police would not have been able to obtain the guns which were introduced.

In a unanimous opinion, the New York Court of Appeals held that " As to the use of the guns unearthed in the attic of the house where Jackson resided, we are compelled by decisions of the United States Supreme Court to apply the rule that, if the evidence to which objection is made was acquired by exploitation of the primary illegality, such evidence. must also be excluded. [Citations.] The guns were the 'fruit' of the inadmissible incriminating statements made to Bradley which led to the search without a warrant. [Citations.] Under the circumstances, it is incumbent upon the District Attorney to show that the location of the guns was discovered through a source untainted by the admissions." (196 N.E.2d at p. 262.)

rule in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and because violation of the rule enunciated in *Griffin* is not likely to recur upon retrial, we need not determine whether the violations of *Griffin* were prejudicial. (See *People* v. *Bostick,* 62 Cal.2d 820, 823 [44 Cal.Rptr. 649, 402 P.2d 529].)

The judgment is reversed and the cause remanded for a new trial.

Traynor, C. J., Tobriner, J., and Peek, J., concurred.

MOSK, J.—I dissent.

It is abundantly demonstrated in the evidence that the defendant knew of his right to counsel and of his right to remain silent. He asked for an attorney on several occasions on December 11 and December 12, and he did in fact remain silent. No statement whatever was given to police officers during that period, and as a result the defendant was released. Thereafter, in accordance with technique approved by the courts, the police continued their independent investigation, seeking evidence against the defendant but no longer from the defendant.

Through their extensive inquiry into events from sources other than the defendant, the police were able to reconstruct the circumstances of the crime, and thus rearrested the defendant on December 14. Within a few minutes he gave a statement which the majority concedes "was not a confession, and so was not prejudicial per se." Actually it was an attempt at exculpation.

The majority suggests the defendant might have feared that "continued assertions of his rights would prove futile." The converse is true, for he not only knew his rights—he had successfully asserted them before to the extent of winning his release. There is nothing in the record to indicate a sudden fear of futility when he gave the statement to Officer Griffin on December 14. There was clearly a waiver of rights. As pointed out in *Escobedo* v. *Illinois,* 378 U.S. 478, at 490 [84 S.Ct. 1758, 12 L.Ed.2d 977] : "The accused may, of course, intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pre-trial stage or at the trial. See *Johnson* v. *Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357]." This court, in the majority opinion in *People* v. *Dorado,* 62 Cal.2d 338, 352 [42 Cal.Rptr. 169, 398 P.2d 361], said: "In the absence of evidence that defendant already knew that he had a right to

counsel during interrogation, the failure of the officers to inform him of that right precludes a finding that he knowingly waived it. . . . Such waiver presupposes knowledge of the right to remain silent; in the absence of evidence of such knowledge, the waiver requires a warning to the accused of that right.''[1] It follows that with such evidence the warning is not mandatory.

In this case we do not have an absence of evidence of previous knowledge, as in *Dorado*. Quite the contrary, there is unmistakable evidence of defendant's knowledge, not from appraising the subjective but from his objective conduct. It has been held that determination whether there has been a waiver depends upon the particular facts and circumstances surrounding the case, including the *conduct* of the accused. (*In re Johnson* (1965) 62 Cal.2d 325, 335 [42 Cal.Rptr. 228, 398 P.2d 420]; *In re Sheridan* (1964) 230 Cal.App.2d 365, 369 [40 Cal.Rptr. 894].) The conversations of defendant with the police on December 11 and 12, according to his own testimony, demonstrate both his legal acumen and an intellectual capacity adequate for comprehending the nature and legal consequences of his acts. Under these circumstances it would be a superfluous exercise in ritual to require police officers to advise a defendant of his rights, of which he had indicated abundant knowledge and which he had, by conduct, waived.

Although other participants in the melee actually struck and shot the victim, this defendant anticipated participating in violence when he went to the dance with a hammer up his sleeve. The evening's denouement was a senseless and brutal murder.

There was no miscarriage of justice. The evidence amply supports the judgment, which should be affirmed. (Cal. Const., art. VI, § 4½.)

McComb, J., and Burke, J., concurred.

---

[1]Reference is made to the criteria of *Escobedo* and *Dorado*, although this case was tried prior to the decisions therein.