**STATE of Missouri, Respondent,**

v.

**George Henry TAYLOR, Appellant.**

**No. 52692.**

Supreme Court of Missouri,
Division No. 1.

Nov. 13, 1967.

Motion for Rehearing or for Transfer to Court En Banc Denied Dec. 11, 1967.

As Modified on Court's Opinion Dec. 20, 1967.

Norman H. Anderson, Atty. Gen., Jefferson City, James M. Byrne, Sp. Asst. Atty. Gen., St. Louis, for respondent.

Robert S. Allen, John L. Davidson, Jr., Daniel E. Singer, St. Louis, for defendant-appellant.

HIGGINS, Commissioner.

Appellant, under indictment for murder, first degree, was convicted of that charge by a jury which assessed his punishmem at life imprisonment. Sentence and judgment were rendered accordingly.

Decedent, Lillian Heller, age 61, lived with her husband in an apartment at 4254 Olive Street. She had worked many years for a downtown law firm and her usual working hours were 9 a. m. to 5 p. m. On December 30, 1964, Mrs. Heller was carrying a large black patent leather purse. She was last seen at work that afternoon. At about 6:45 to 7:00 p. m. she was found lying at the bottom of the stairway in the darkened hallway of her apartment building. She had been shot and died shortly thereafter. A search of the immediate area revealed a wallet containing about $138.50 "lying along her right side" and some items of jewelry on her person "underneath her." The purse was not found. The witness who discovered the body heard cries for help; the husband at home upstairs heard no shot. Investigation at the scene produced no eyewitnesses; two colored boys were reported running away from the vicinity about the same time the body was found. The coroner's opinion was that Mrs. Heller was shot in the right chest at close range.

On January 2, 1965, defendant cashed a $10 check in an East St. Louis, Illinois, grocery store. The check was payable to Lillian Barlar, the name by which Mrs. Heller was known at her place of employment. The check had been given to Mrs. Heller (Barlar) December 15, 1964, as a bonus by her employer. The check was endorsed by defendant in the presence of the store owner after defendant's mother vouched for him. Shortly after receiving the money on it and leaving the store, defendant returned, asking for the check, but it had been further negotiated to a bread truck driver.

On February 5, 1965, the bookkeeper at the law firm noticed that the endorsement was not the signature of Mrs. Heller. She

called the police and, on February 11, 1965, defendant was arrested and charged with suspected forgery and murder.

Defendant was interrogated on February 11, 12, 13, and 18, 1965, and his oral statements were suppressed by the court on the ground that the warnings given defendant did not satisfy the requirements of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. A gun was traced to defendant and a ballistics expert gave his opinion that a bullet fired from it matched the bullet taken from the victim's body.

The defendant did not testify but offered an alibi witness.

The case was submitted on the felony-murder doctrine and, although contending that defendant should have received an instruction on second degree murder, appellant does not contend that the State failed to make a submissible case.

Appellant contends that the court erred in overruling his motion to suppress and admitting into evidence the gun and ballistics testimony on the ground that they were obtained as a result of interrogation properly suppressed as illegal by the trial court. Stated another way, the contention is that the State "did not prove that the gun was obtained from an independent source," but was, instead, "fruit of the poisoned tree."

The issue thus presented is whether the gun and ballistics evidence was a product of illegal interrogation and therefore inadmissible, or whether there was evidence adduced by the State from which the court properly could find that the questioned evidence was not a direct result of illegal interrogation and therefore admissible.

■ "[U]nless and until such warnings (those concerning an accused's privilege against self-incrimination) are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." Miranda v. State of Arizona, supra, 384 U.S. 1. c. 479, 86 S.Ct. 1. c. 1630. Such exclusionary rule has

no application, however, where the State learns of the allegedly inadmissible evidence from an "independent source," Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319, or where the connection between the lawless conduct of the police and the discovery of the challenged evidence "may have become so attenuated as to dissipate the taint," Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307; and "(not) all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 417, 9 L.Ed. 2d 441.

The gun, Exhibit 13, and ballistics test were held admissible after a hearing outside the presence of the jury, and the record at that hearing demonstrates the propriety of, and supports the court's ruling within the meaning of the foregoing cases.

Troy Carter previously had identified himself as the manager of an automatic car wash at 3675 Market Street. He had employed the defendant, George Henry Taylor, around January 7, 1965, and he worked for about a week.

"By Mr. Walsh (State's attorney): Q Mr. Carter, I'll hand you what has been marked State's Exhibit No. 13, sir, and ask you have you seen that gun before, ever before? A Yes, sir. Q Where did you first see that gun? A Received it from George Taylor * * *."

Next follows the continuing objection that "all of the testimony of this man is the product of that poisoned tree."

"Q (By Mr. Walsh) Now, when and where did you first see that gun? A Ap-

proximately the middle of January. Q Of what year? A Of 1965. Q And where were you when you first saw it? A I was at the car wash.

"Q And who gave you that gun? A George Taylor. Q That's the defendant here? A Yes, sir. Q And he gave it to you at the car wash? A Yes, sir. Q· What time of the day? A Around five o'clock in the afternoon. Q Was he working that day? A No, sir. Q What was he doing there? A He called me and wanted to borrow money. Q He called you on the telephone? A Yes, sir.

"Q He wanted to borrow money? What did he say? A I wouldn't let him have the money. Q No. No. What did he say? You say he wanted to borrow money. What did he say? A He just said: I will need fifteen dollars. Q What did you say? A I told him I didn't have it to loan. Q What did he say? A He said if I would loan it to him he would let me hold his father's gun for security.

"Q All right. And after that he came to the car wash? A That's right. * * * Q All right. Were you outside when he pulled up in the Marcella cab? A I was standing in the office. I could see out there. Q Did you then go outside? A Yes, sir. Q Did you get in the Marcella cab? A No, sir. Q Did he get out of it? A Yes, sir. Q Did you have a car there? A Yes, sir. Q Where was it parked? A It was parked near where the cab parked. Q Did you get in your car? A Yes, sir. Q Did he get in your car? A Yes, sir.

"Q Did you see any gun when he got in your car? A He took it out of his pocket. Q Out of his pocket. You didn't see it before he took it out of his pocket? A No

"Q Is that the gun he took out of his pocket? A Yes. Q Did he hand you that gun? A Yes, sir. Q What did he say when he handed it to you? A He says: It shoots good. Try it if you want to. I fired it the other day, and it shoots good. Q Did he say then at that time whose

gun it was? A He said it was his father's and he did want it back. Q Repeat that. A He said: It's my father's pistol. I do want it back. Q He does want it back. Did you then loan him some money? A Yes, sir. Q How much did he ask for? A Fifteen dollars. Q How much did you give him? A Fifteen dollars.

"Q All right. And after that, what did you do with the gun? A I took it upstairs and I wrapped it, took the shells out of it. Q How many shells were in it? A There were four. Q When he handed it to you, was it loaded with those four? A Yes, sir. Q You took the shells out. Go ahead. A I took the shells out and wrapped it in a shop towel, put the shells in a little box, took it all upstairs and put it on top of a little room up there. THE COURT: Top of what? THE WITNESS: Top of a small room. Had been a rest room at one time. Q (By Mr. Walsh) All right. Now, and you kept it up there for sometime, is that correct? A That's right.

"Q Now, did you turn that gun over to the police? A Yes, sir. Q What police officer did you contact? A I contacted Sergeant Al Graeff. Q Sergeant Al Graeff? A Sergeant Al Graeff. Detective. THE COURT: How do you spell that? THE WITNESS: G-r-a-e-f-f. Q (By Mr. Walsh) Is he in the Intelligence Unit of the Police Department? A I'm not sure. I think he is, but I'm not certain what department he is in. Q And you knew him? A Yes, he's a friend of mine. Q Did you tell him that you had a gun that Taylor pawned with you? A Yes, sir. Q All right. Did Graeff come out to get the gun? A No, sir. Q Did he send somebody out to get the gun? A Yes, sir. Q Who did he send out? A Detective Rowane. Q Detective Rowane of the Homicide Squad? A That's right.

"Q All right. Had you found out that Taylor was under arrest? A Yes, sir. Q And is that why you called Sergeant Graeff to tell him that you had the gun? A Yes, sir. Q Nobody asked you if you

had his gun, did they? A No, sir. Q So you voluntarily called Sergeant Graeff and turned it over? A Yes, sir. Q You had discovered he was under arrest and charged with murder? A Yes, sir. Q And nobody asked you again, Troy Carter, if you had any gun, did they? Q No, sir."

On cross-examination:

"MR. DAVIDSON: Q What day was this you turned this over to Sergeant Rowane? A I'm not sure. I think it was the 17th of February. Q Now, had Sergeant Rowane or any other police officer been to your car wash prior to that time? A Yes, sir. Q And when was that? A That was the day before, the day before I called them up again. Q And had they been making inquiry about a gun? A No, sir. Except one trip. The last trip they did. Q But before that, hadn't they interrogated other people around the car wash? A Yes, sir. Q About a gun, hadn't (they)? A I don't know what it was about. Q But it could have been, couldn't it? MR. WALSH: Object to what it could have been. THE COURT: Objection sustained. Q (By Mr. Davidson) But in any event you first learned about Taylor being under arrest when the police were out there, didn't you? A Yes, sir."

Defendant then called Detective Rowane.

"BY MR. DAVIDSON: Q Your name, sir? A Thomas Rowane. Q And your profession is that of a police officer, sir? A Yes, sir. Q And you hold the rank of Detective in the Metropolitan Police Department, is that correct, sir? A Yes, sir. Q And with Corporal Dwyer you were investigating the murder of Lillian Heller? A Yes, sir. Q As part of that investigation, you interrogated the defendant, did you not? A Yes, sir. Q You see him in the court here? A Yes, sir. Q And indicating the defendant, George Henry Taylor. And you interrogated him on February 12, did you not? A Yes, sir. THE COURT: Sixty-five? MR. DAVIDSON: 1965. Thank you, Judge. Q (By Mr. Davidson) And you asked him about the gun that he used, did you not? You asked him about any gun, did you not? A I can't say I asked him about the gun on February 12th. No, sir.

"Q Supposing we get the police report and you refresh your memory. I'm handing you photostats of the documents which were produced by the State at the order of Judge Casey, and I want you to look them over, and I want you to tell me what days you interrogated Mr. Taylor. A I didn't interrogate him on the 12th, but I think the statement he gave us about the gun was on the 13th.

"Q All right. He gave it to you on the 13th. And what did he tell you about the gun? A He gave us different versions of what happened to the gun. At first he stated that he was stopped on the street and the gun was taken away from him by a police officer, and we asked him who the police officer was and where it occurred and he couldn't state. Q What else did he say about it? A And he stated that he had the gun in his coat pocket and he was in a tavern and the gun was stolen out of his coat pocket while he was in this tavern. Again he was questioned as to the location of the tavern or any other information and he stated he couldn't give any. Q And what else did he say about it? A That he pawned the gun to a light-skinned Negro male who was about thirty years of age. He pawned it for fifteen dollars, and this was at a car wash where he worked on the 3600 block of Market Street, and he stated that this Negro male had quit there about a week ago.

"Q And what did you do then after the interrogation? Did you go to the car wash? A Not that particular day. Q What day did you go? A On the 17th of February. Q Didn't you go out there and—Did you or any other police officer go out there before the 17th? A Not from our office as far as I know. No, sir.

"Q Now, I want to direct your attention to—You remember testifying before Judge Casey this summer? A Yes, sir.

"Q I asked you this question: That was after interrogating everything you had gotten information about the car wash, is that it? And you made this answer: Yes, sir. And, question: When you said, 'We went out to the car wash,' I assume you're referring to—* * *

"Q (By Mr. Davidson) And after you questioned him and he told you the gun was at 3300 Market, you went out there, is that it? Answer: I am not quite sure he said it was 3300 or whether he said it was a car wash on Market. However, later on checking we did go to the car wash and recovered the gun. Question: That was after interrogating him and everything you had gotten the information about the car wash, is that it? Answer: Yes, sir. When you said we went out to the car wash, I assume you were referring to your fellow officer, Corporal Dwyer, is that correct? Answer: Yes, sir. We went to the car wash and first interviewed this man and then later he called us and told us there was a gun out there, and Corporal Dwyer and I went out to the car wash. Who did you interview out there? Troy Carter. Now, didn't you go out there one time before you recovered the gun? A That whole statement is correct except that I went out there by myself the first time. It's all the same day. Q You went out there the first time? A Yes, sir. Q And then after that you got a call from Troy Carter who had a gun there, is that it? A Well, I didn't get the call. Q But it came in after you went out there? A Yes, sir. Q And you had made inquiry about a gun, did you not? A Yes, sir. MR. DAVIDSON: I have no further questions of this witness at this time."

On cross-examination:

"BY MR. WALSH: Q Now, Officer Rowane, no one called you about having a gun, Mr. Carter or anyone else, did they, sir? A No, sir. THE COURT: What was his question? MR. WALSH: Did anyone call him about having a gun, Mr. Carter or anyone else. And his answer was 'No'.

"Q (By Mr. Walsh) And of course you know of your own personal knowledge that Mr. Carter called Sergeant Graeff of the Intelligence Unit about this gun?

"MR. DAVIDSON: Well, I'm going to object to that question. MR. WALSH: I can ask him. This is cross examination, Your Honor. THE COURT: If he knows. Q (By Mr. Walsh) Do you know? A Yes, sir.

"Q And you further know that Sergeant Graeff then passed this information on to Captain Walsh of the Homicide Squad. Do you know that? A That's my understanding.

"MR. DAVIDSON: I ask the answer be stricken. MR. WALSH: It's cross examination. THE COURT: To which? THE WITNESS: That's my understanding, yes, sir. That Sergeant Graeff— MR. DAVIDSON: I'm going to object to what his understanding is or anything else. THE COURT: Objection sustained as to what his understanding is.

"Q (By Mr. Walsh) And of course you —Your Department before there was any conversation about the gun was aware that Taylor worked at a car wash somewhere, isn't that correct? A Yes, sir. Q And were you not investigating car washes all over the City of St. Louis to find out which car wash he worked at? A Yes, sir. Q You were? A Yes, sir. THE COURT: Wait just a minute now. All right.

"Q (By Mr. Walsh) And when you testified over there in front of Judge Casey you were asked the question whether or not he told you the gun was at 3300 Market, your answer was: I'm not quite sure he said it was 3300 or whether he just said it was a car wash on Market. Is that correct? A Yes, sir. Q As a matter of fact, the car wash is actually in the 3600 block of

Market Street, not the 3300, is that correct? A That's correct.

"Q And of course when you went out there, you were looking for a light-skinned Negro male approximately thirty years of age, isn't that correct? A Yes, sir. Q You were not looking for a white man named Troy Carter? A No, sir. Q And you interviewed Negroes working at the car wash of that approximate age, is that correct? A Not at that particular time. No, sir. Q Did you at a later time? A Yes, sir. Q And you never did interview Mr. Carter as to whether or not he had the gun, the white man, did you? A No, sir. MR. WALSH: No further questions."

On redirect examination:

"Q (By Mr. Davidson) Were you on the phone when that man called? A No, sir. Q Were you with Mr. Carter? A No, sir. Q Were you in the Intelligence Room when he called? A No, sir. Q Then you don't know whether anybody called, do you?

"MR. WALSH: Your Honor, I object to the form as being argumentative and further he has called this witness. It's his witness and he's bound by his answers. It's improper. MR. DAVIDSON: I'm not bound by his answers. THE COURT: Objection overruled.

"MR. DAVIDSON: What's the question? Answer the question. THE WITNESS: Excuse me. Repeat the question. MR. DAVIDSON: Read it to him. THE COURT: He said he was in neither place.

"Q (By Mr. Davidson) And you don't know then, do you, whether anybody called anybody, do you? A Only what I was told, sir. * * * Q (By Mr. Davidson) He (defendant) told you what car wash he worked at, didn't he? A Yes, sir. Q And there's only one car wash out in that general vicinity, is there not? A I know there's one on Market Street, the one we're talking about. MR. DAVIDSON: No further questions. MR. WALSH: No fur-ther questions, Your Honor. THE COURT: Do either of you have any further evidence on this particular issue, that is, the circumstances that led to the obtaining of this weapon by the police? MR. WALSH: No, Your Honor. I think it's very clear. The witness has testified under oath that he called the Police Department, told them that he had the weapon, called the Sergeant in the Intelligence Unit and turned it over, and this man has testified that he went out to look for a thirty-year old Negro male, and he did not ask Mr. Carter if he had any gun, so I think it's very clear. * *

"THE COURT: Recall Troy Carter. I'm going to ask Troy Carter one question. * * * Q (By the Court) Mr. Carter, you were aware that police officers were making an investigation at your car wash in connection with Mrs. Heller's death, were you not? A I didn't know what it concerned. They were just asking about George Taylor. Q They were asking about George Taylor? A Yes, sir. If he had worked there. I didn't know what it concerned. Q You knew that he had been arrested, is that true? A Yes, sir, but I don't know on what charge. Q What did the police ask you when they interrogated you? A They never interrogated me until the second trip and then they asked me about the gun, if I had seen any of the fellows with a gun. Q They asked you on the second trip if you had seen any of the fellows with a gun? A Yes, sir. Q It was on the second trip that you turned the gun over to them? A Sure was, Your Honor. Q And that was after your telephone call to Sergeant Graeff, was it not? A That's right. Q Do you know what inquiry or what questions the police asked on their first trip to the car wash? A Sure don't, Your Honor. Q You don't? A They didn't talk to me. Q You knew they were asking questions, but that's all? A That's all. Q Did you know that they were out there searching for a gun? A No, sir, Your Honor. * * *

"THE COURT: I find from the evidence that the pistol in question, Exhibit 13, was not obtained by the Police as a direct result of police interrogation of the defendant within the meaning of the fruit of the poisoned tree doctrine and under those circumstances, Mr. Walsh, you may proceed on that basis."

Thereafter, in the presence of the jury, Mr. Carter reiterated much of this testimony, including an identification of the gun, a description of his receipt of it in pawn from defendant, and his delivery of it to the officer who deposited it with ballistics. Detective Rowane, of course, was not permitted to disclose defendant's statements.

Appellant relies on cases which, although stating and warranting application of the exclusionary rule, are to be distinguished from this case. In Wong Sun v. United States, supra, one Toy made certain incriminating declarations which were properly excluded from evidence because of the circumstances under which they were made. Those declarations led directly to one Yee as the possessor of the narcotics which were seized and used as evidence against Wong Sun, Toy and Yee. Their conviction was reversed for failure to exclude the narcotics as an unlawful product of an unlawful statement. The case is distinguished by the court's own statement of the issue: "We now consider whether the exclusion of Toy's declarations requires also the exclusion of the narcotics taken from Yee, to which those declarations led the police. The prosecutor candidly told the trial court that 'we wouldn't have found those drugs except that Mr. Toy helped us to.' Hence this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence 'from an independent source,' Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319." 371 U.S. 1. c. 487, 83 S.Ct. 1. c. 417. In United States v. Paroutian, 2 Cir., 299 F.2d 486, two illegal searches of an apartment were made at which times it was noted that a closet had a new cedar lining installed by the oc-cupant. The lining was tapped but attempts to remove it were unsuccessful. At a later time, after possession of the premises had been returned to the landlord, a lawful search was conducted during which it was discovered that the closet contained a secret compartment which served as a cache for narcotics. Narcotics seized there were used as evidence in the ensuing prosecution. The question was "whether the evidence actually seized in the (last) search, which, occurring after Paroutian was out of possession of the premises and lawful under Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, is 'tainted' by the first two illegal searches." 299 F.2d 1. c. 488. The court stated that the exclusionary rule "extends only to facts which were actually discovered by a process initiated by the unlawful act. If information which could have emerged from an unlawful search in fact stems from an independent source, the evidence is admissible." 299 F.2d 489 [4]. In rejecting the claim of evidence from an "independent source" the court held: "The extreme interest in the closet shown by the agents on the first unlawful search demonstrates that it was Spolan's (landlord's agent) statement about the closet lining which ultimately led to the discovery of the heroin and the letter. Of course, even without an unlawful search, the agents might have found the secret compartment. But that is not what happened * * *. Had the government shown that it had knowledge of the secret compartment from an independent source, the evidence would of course have been admissible." 299 F.2d 489 [5, 6]. In People v. Ressler, 17 N.Y.2d 174, 269 N.Y.S.2d 414, 216 N.E.2d 582, defendant, in the absence of his lawyer, was illegally misled into making a statement in which he told that he threw his gun into the river. The illegal statement was properly excluded, and so also the gun, because its retrieval from the river could be traced to no clue or lead other than that which was furnished by the accused himself. The defendant in People v. Buchanan, 63 Cal.2d 880, 48 Cal.Rptr. 733, 409 P.2d 957, was

once arrested and, upon refusal to talk and request for counsel, was released. He was rearrested later and, without further advice on his right to counsel, was trapped into describing a fatal fight and shooting at a dance hall and his own possession of the gun recovered from him as a direct result of his statement. "It (was) obvious that, since the gun was secured by the police as a result of the statement obtained in violation of the rule * * * it too should have been excluded as the 'poisonous fruit' of the illegal statement." 409 P.2d l. c. 961 [6]. In People v. Robinson, 13 N.Y.2d 296, 246 N.Y.S.2d 623, 196 N.E.2d 261, defendant's admission was inadmissible because his lawyer was not present, and guns found in the attic of his house as described in his admission were likewise inadmissible, clearly a situation of "exploitation of the primary illegality, (requiring that) such evidence must also be excluded." 196 N.E.2d l. c. 262 [4].

◼ In contrast, the facts of this case warrant a finding that the gun was not a "fruit of the poisonous tree" but came instead from an independent source. At best, defendant's suppressed statement led certain police to look for a car wash at 3300 Market in search of a "light-skinned negro" with whom he had left a gun. Those officers found neither the described car wash, such a described person, nor the gun as a direct result of the statement. They did, however, continue their efforts and interviewed some negroes at a car wash at 3675 Market Street. Again the result was negative, in that nothing in defendant's statement resulted in finding the "light skinned male" or in obtaining the gun. On the following day Troy Carter learned that police had been at his car wash (not the one described in defendant's statement) asking questions about his former employee, George Taylor. He was not told the subject of the investigation, nor was he advised that the questions asked concerned a gun or any crime, and there is apparent contradiction in his testimony on the extent of prior knowledge

of the circumstances of defendant's arrest. Even if he were then aware that Taylor had been arrested on suspicion of murder, the evidence shows and warrants a finding that independently and of his own volition Troy Carter called his friend in the police department and volunteered information that he had possession of a gun pawned to him by defendant. From that source, independent of defendant's statement, came the gun ultimately shown by ballistics tests to be the murder weapon. Such circumstances are clearly within the exceptions to the exclusionary rule of the cited cases. Had defendant's statement described the car wash at 3675 Market, named Troy Carter as the bailee of the gun, and had such statement led police to Carter and caused production of the gun, the case might well have been one calling for application of the exclusionary rule.

A parallel to the problem of this case is contained in the recent "line-up" cases in the United States Supreme Court, e. g., United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 1939, 18 L.Ed.2d 1149–1164–1166 [14–17]: "We come now to the question whether the denial of Wade's motion to strike the courtroom identification by the bank witnesses at trial because of the absence of his counsel at the lineup required, as the Court of Appeals held, the grant of a new trial at which such evidence is to be excluded. We do not think this disposition can be justified without first giving the Government the opportunity to establish by clear and convincing evidence that the incourt identifications were based upon observations of the suspect other than the lineup identification. * * * Where, as here, the admissibility of evidence of the lineup identification itself is not involved, a per se rule of exclusion of courtroom identification would be unjustified. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307. * * * We think it follows that the proper test to be applied in these situations is that quoted in Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (see quotation

previously set forth). * * * On the record now before us we cannot make the determination whether the in-court identifications had an independent origin. This was not an issue at trial, although there is some evidence relevant to a determination * * *. We therefore think the appropriate procedure to be followed is to vacate the conviction pending a hearing (in the District Court) to determine whether the in-court identifications had an independent source * * *." The obvious difference between United States v. Wade and this case is that this is a stronger case for the exception to the exclusionary rule because of the previously demonstrated presence of evidence in the existing record from which the court properly determined the gun admitted in evidence to have come from an independent source as opposed to being "fruit of the poisoned tree."

Appellant charges the court erred in failing to declare a mistrial because "the state improperly prejudiced the defendant by asking a witness in the presence of the jury about his unlawful interrogation of defendant."

The complaint arises from this context: Prior to trial and before a judge other than the trial judge, defendant's motion to suppress his statement was overruled; but during trial a similar motion was sustained on the ground that he had not been given the entire warning on constitutional rights as set forth in Miranda v. State of Arizona, supra. In addition the defense advised the court and the state of objections to the admission of the statement or any reference to it. At trial the following took place in the examination of Sergeant Dwyer:

"Q (By Mr. Walsh) Did you have any conversation with him? A Yes, sir.

"MR. DAVIDSON: I object and at this time I'm asking the jury be withdrawn and a mistrial declared. THE COURT: Motion for mistrial is denied. MR. DAVIDSON: I'm objecting to the question. THE COURT: Objection to that question is overruled. Now— MR. WALSH: May I proceed, Your Honor? THE COURT: You have nothing else at this point? MR. DAVIDSON: No, sir. THE COURT: Wait just a minute. MR. WALSH: Yes, Your Honor. THE COURT: All right.

"Q (By Mr. Walsh) Now, did you direct any questions to him? A Yes, sir.

"MR. DAVIDSON: Your Honor, I'm going to object again. This is highly improper. We have discussed this before, and there's no showing that there has been any proper warning given. This is questions solely put to prejudice this defendant. I'm asking the jury be withdrawn and a mistrial declared. MR. WALSH: Your Honor, if the Court please, Mr. Davidson should confine himself to the rules of the Court. If he wants to make a speech, he should get a box. THE COURT: The motion for a mistrial is overruled. Will you please both come over here?"

Thereafter, a hearing outside the presence of the jury was conducted resulting in a continued suppression of any statements made by defendant on the ground that "defendant was not provided the safeguards outlined in Miranda prior to his in-custody interrogation," the court further stating in overruling the motion for mistrial, "I don't believe Counsel's asking the questions that he did was of such a prejudicial nature as to warrant a new trial."

Appellant's contention is that the two questions were references to an unlawful and properly suppressed statement and were, therefore, prejudicial, all of which warranted a declaration of mistrial.

■ Appellant concedes that "declaration of a mistrial does rest largely in the discretion of the Trial Court * * * (but) here we rely principally upon United States v. Pinkerman, 374 F.2d 988 (4th Cir., 1967)," where also defendant's statement was suppressed for failure to comply with Miranda v. State of Arizona, supra. That case is not in point, however, because the

question asked by the prosecutor of the state's witness, Special Investigator Woodward, "Did Mr. Pinkerman under those circumstances and at that time (at the time of his arrest) make any comment in your presence?" could well have conveyed the impression to the jury that the defendant had made some sort of confession or incriminating statement at the time of arrest which was, on trial, being hidden. In contrast, the most that can be said of the two criticized questions asked of Sergeant Dwyer is that they establish that Dwyer did converse with and question defendant. There is no implication of any answer, incriminating or otherwise, such question or conversation is not shown to have related to this case, and they are not indicative of patent unfairness. Under these and the other circumstances of this case, the trial court did not abuse its discretion in not declaring a mistrial and examination of the whole record indicates great care by the trial judge in this instance, as throughout the trial, in preserving appellant's right to a fair trial. State v. Taylor, Mo., 324 S.W.2d 643, 647 [7].

Other citations by appellant are equally distinguishable from this case: In Moorer v. State of South Carolina, 4 Cir., 368 F.2d 458, defendant's statement had been suppressed in anticipation of Miranda v. State of Arizona, supra, yet officers were permitted to testify that he had made a free and voluntary statement, clearly implying the existence of an incriminating admission. And in United States v. C. L. Guild Construction Co., D.C.R.I., 193 F.Supp. 268; State v. Selle, Mo., 367 S.W.2d 522, and State v. Spencer, Mo., 307 S.W.2d 440, the questions asked simply made reference to other indictments or charges in an improper effort to impeach the defendant's case.

■ Finally, appellant charges error in failing to instruct on murder in the second degree.

This case was submitted under the felony-murder doctrine, i. e., under Section 559.010, V.A.M.S., which, among other definitions, defines first degree murder as " * * * every homicide * * * committed in the perpetration or attempt to perpetrate any * * * robbery * * *." There was no attempt to prove premeditation or malice aforethought, but there was evidence from which the jury could find that the defendant killed his victim while robbing her of her purse and a $10 check which he later negotiated for cash. Appellant argues that the evidence of an attempt to rob is not conclusive but concedes that "the evidence on that issue is at best a jury question." Where the evidence supports a finding that a homicide occurred during perpetration of a robbery, an instruction on first degree murder under the felony-murder doctrine is supported and properly given to the exclusion of an instruction on a lesser offense. State v. Bradley, 361 Mo. 267, 234 S.W.2d 556, 563 [21]. State v. Kyles, 247 Mo. 640, 153 S.W. 1047, and State v. Henke, 313 Mo. 615, 285 S.W. 392, cited by appellant, are not in point in that they are not felony-murder cases.

Review required by Criminal Rules 28.02 and 28.08, V.A.M.R., shows the indictment in proper form and sufficient. Defendant was accorded jury trial upon his plea of not guilty with competent counsel throughout trial and on appeal. The verdict is in proper form and responsive to the issues. The punishment is within legal limits. Motion for new trial was considered. Allocution was granted.

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

All concur.